## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DANIEL P. KELLY,<br>3748 United Street<br>Rosamond, CA 93560,<br><br>            Plaintiff,<br><br>    v.<br><br>UNITED STATES OF AMERICA,<br>United States Attorney's Office<br>555 4th Street, NW<br>Washington, D.C. 20530,<br><br>U.S. DEPARTMENT OF DEFENSE<br>1400 Defense Pentagon<br>Washington, DC 20301,<br><br>U.S. DEPARTMENT OF THE ARMY<br>1500 Defense Pentagon<br>Washington, DC 20310,<br><br>PHYSICAL DISABILITY BOARD OF<br>REVIEW<br>3351 Celmers Lane<br>Joint Base Andrews, MD 20762, and<br><br>ARMY REVIEW BOARDS AGENCY<br>251 18th Street South, Suite 385<br>Arlington, VA 22202,<br><br>            Defendants. | Case No. _____<br><br>**COMPLAINT** |

## INTRODUCTION

1.      This is an action for administrative review and equitable relief owed to Plaintiff

and United States Army veteran, Daniel P. Kelly.  This action challenges a decision issued by the

Department of Defense Physical Disability Board of Review ("PDBR").

2.      When a military branch determines that a service member has one or more disabilities that make the member unfit for continued military service, he or she is normally separated from service with either a (1) medical separation, or (2) medical retirement.  Whether a service member is medically separated or retired is contingent on the combined disability rating that the military department assigns to these disabilities based on the conditions that render the service member unfit for continued service.  If the service member is medically retired, he or she is entitled to military health care (TRICARE) for the retiree, the retiree's spouse, and the retiree's minor children, as well as access to military bases and commissary privileges, among other things.  By contrast, a service member who is medically separated is not entitled to these benefits.

3.      On February 25, 2005, the United States Army's Physical Evaluation Board ("PEB") determined that Kelly should receive only a 10% disability rating and be medically separated from the Army with severance pay instead of receiving the stature and benefits of a medical retirement.  The PEB based this determination in part on a finding that Kelly only suffered from the skin disorder, Discoid Lupus Erythematosus ("DLE") rather than the significantly more severe autoimmune disorder, Systemic Lupus Erythematosus ("SLE").  This determination was inconsistent with substantial evidence that Kelly suffered from SLE during his time of service, including the Medical Evaluation Board's ("MEB") prior assessment on December 30, 2004, that Kelly suffered from eight different symptoms that were consistent with an SLE diagnosis.

4.      On October 25, 2013, Kelly asked the PDBR to reassess the PEB's 2005 decision and award him a medical retirement.  On July 25, 2015, the PDBR issued a decision upholding the PEB's ruling.  The PDBR, however, erred when it affirmed the PEB's decision that Kelly

should be medically separated instead of being medically retired.  The PDBR's decision was arbitrary, capricious, contrary to law, and unsupported by substantial evidence.  First, the PDBR did not follow its own procedures when it issued a decision about Kelly's case.  Second, the PDBR ignored substantial evidence that Kelly suffered from SLE during his time of service.  The PDBR's two errors deprived Kelly of a higher disability rating and thus the stature and benefits that flow from being a military retiree.

5.      The PDBR failed to follow its own procedures on Kelly's case, because it did not wait for and review the Department of Veterans Affairs ("VA") claims file which included both VA rating decisions and service medical records before rendering its decision.  This is wholly inconsistent with Department of Defense Instruction 6040.44, which requires that "[f]or each case referred to the PDBR, the PDBR will review the complete case record that served as the basis for the final Military Department PEB rating determination and, to the extent feasible, collect all the information necessary for competent review and recommendation."[1]  Thus, the PDBR acted arbitrarily and capriciously by choosing to make a final determination on Kelly's case without first reviewing Kelly's medical records held by the VA.

6.      Additionally, and independently, even in the limited records the PDBR did review, it ignored extensive medical records demonstrating that Kelly suffered from SLE and not merely DLE at the time he left the Army, rendering its decision unsupported by substantial evidence.  Kelly asks this Court to grant him relief by issuing an order that the PDBR's decision was arbitrary and capricious, that his combined disability rating should be raised, and that his

---

[1] DoD Instruction 6040.44, Physical Disability Board of Review (PDBR) at 12 (July 2, 2015), http://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/604044p.pdf?ver=2017-12-04-074059-830 (last visited January 9, 2019), attached hereto as Exhibit 1.

separation from the Army should be reclassified as a medical retirement, with all incumbent rights, privileges, and associations.

## JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this case raises federal questions under the Administrative Procedure Act, 5 U.S.C. § 702 *et seq.*

8.    Plaintiff seeks solely equitable relief in this action, namely, an increase of his military disability rating and to be placed into medical retirement status.

9.    Plaintiff sought relief for this issue *pro se* before the PDBR, which was denied.

10.   Review of the PDBR's ruling with respect to Plaintiff's requests for an increase of his disability rating and to be placed into medical retirement status is appropriate because the ruling was a final agency action for which there is no other adequate remedy in a court.  *See* 28 U.S.C. § 704.

11.   Venue in this Court is proper under 5 U.S.C. § 703 because this is a court of competent jurisdiction.  Venue in this Court is also proper under 28 U.S.C. § 1391(b)(1), because a Defendant resides in this judicial district.

12.   In accordance with 28 U.S.C. § 2501, this action is brought within six years of the PDBR's decision denying relief.

## PARTIES

13.   Plaintiff Daniel P. Kelly is a citizen of the United States and a veteran of the United States Army.  He is a resident of Rosamond, California.

14.   Defendant United States of America is a resident of this judicial district (28 U.S.C. § 1391(c)(2)) and with respect to the present action, acted through its government agencies, Defendant U.S. Department of Defense, Defendant PDBR, Defendant U.S. Department of the Army, and Defendant Army Review Boards Agency.

15.     Defendant U.S. Department of Defense is an executive branch department of the U.S. government and resident of this judicial district.   The U.S. Department of Defense coordinates and supervises all agencies and functions of the federal government related to the U.S. Armed Forces, including Defendant U.S. Department of the Army and Defendant PDBR.

16.     Defendant U.S. Department of the Army is one of three military departments within Defendant U.S. Department of Defense.   Defendant U.S. Department of the Army exercises authority over Defendant Army Review Boards Agency and is a resident of this judicial district.

17.     Defendant Army Review Boards Agency serves as an administrative review body for personnel actions and administers the Army Board for Correction of Military Records, the Army Discharge Review Board and the Army Grade Determination Review Board.   Defendant Army Review Boards Agency is located in Arlington, Virginia.

18.     Defendant PDBR is a joint review board established by Congress and implemented by Defendant U.S. Department of Defense.   Defendant PDBR is located in Joint Base Andrews, Maryland.

## FACTUAL ALLEGATIONS

### Kelly's Military Service Record

19.     Prior to enlisting in the military, Kelly lived a full and active life that included performing on his high school drumline, scuba diving, and studying American Style Karate.

20.     Kelly enlisted in the Army on July 28, 2000 and began his Active Duty Service on November 15, 2000.   Kelly followed in his father's footsteps by serving as a journalist in the Army.

21.     From January 2002 to December 2002, Kelly served in the 27th Public Affairs Detachment where he worked as a writer, photographer, editor, newspaper distributor, web

master, and media escort.  During that time he spent approximately seven months serving at Guantanamo Bay, Cuba and five months at Fort Drum, New York.

22.     From December 2002 to April 2005, Kelly served in the 25th Infantry Division's Public Affairs Office where he worked as a writer, photographer, editor, community relations officer, speech writer, media trainer, NBC (Nuclear, Biological, Chemical) trainer, convoy driver, and base driver.  During that time he spent approximately five months serving at Bagram Air Field, Afghanistan and twenty-five months serving at Schofield Barracks, Hawaii.

23.     Kelly received numerous commendations and awards for his military service, including but not limited to the Army Commendation Medal (twice), the Joint Service Commendation Medal, the Global War on Terrorism Service Medal, and the Army Achievement Medal.

24.     Prior to becoming debilitated by Systemic Lupus Erythematosus, Kelly's intention was to continue his honorable military service and spend his career as a journalist in the Army.

## Kelly's Medical Condition

25.     Starting as early as May of 2003, Kelly began to exhibit symptoms of the severe autoimmune disorder called Systemic Lupus Erythematosus ("SLE").  SLE is a disease that causes the body's immune system to incorrectly attack the body's own organs and tissues, leading to inflammation and damage.[2] Rather than being confined to the skin, SLE is "a florid disease with systemic involvement of heart, lungs, brain, kidneys and other organs."[3]

---

[2] Sarah Ringold, *Systemic Lupus Erythematosus*, 293 JAMA 3130 (2005), attached hereto as Exhibit 2.
[3] Suresh Panjwani, *Early Diagnosis and Treatment of Discoid Lupus Erythematosus*, 22 J. Am. Bd. Fam. Med. 206, 206 (2009), attached hereto as Exhibit 3.

26.     Some of the key symptoms or indicators of SLE that have been identified include: swelling, stiffness and pain in joints; Butterfly-shaped rash on the face that covers the cheeks and bridge of the nose or rashes elsewhere on the body (also called a Malar Rash); skin lesions that appear worse with sun exposure (photosensitivity); fingers and toes that turn white or blue when exposed to cold or during stressful periods (Raynaud's phenomenon); shortness of breath; chest pain; fatigue; fever; dry eyes; headaches, confusion and memory loss;[4] hair loss;[5] Uveitis (inflammation of the uveal tract, which lines the inside of the eye behind the cornea);[6] abdominal pain;[7] swelling of the tissue lining the lungs (pleural effusion) or the heart (pericarditis); and positive antinuclear antibodies (ANA) results.[8]

27.     On the opposite end of the lupus spectrum is the less severe Discoid Lupus Erythematosus ("DLE"), which is "confined mainly to the skin."[9]  Although DLE and SLE share the symptoms of rashes and inflammation on the face, "DLE tends to run a less severe course than SLE."[10]  In addition, approximately 25% of patients that suffer from SLE will also experience chronic DLE skin lesions.[11]

28.     During his time of service, Kelly experienced substantially all of the SLE symptoms referenced above, as well as suffering from chronic DLE skin lesions. The following

---

[4] Mayo Clinic Staff, *Lupus*, Mayo Clinic (Oct. 25, 2017), https://www.mayoclinic.org/diseases-conditions/lupus/symptoms-causes/syc-20365789 (last visited January 9, 2019), attached hereto as Exhibit 4.

[5] Exhibit 2, Ringold, *supra* note 3 at 3130.

[6] Kevin Gallagher et al., *Association of Systemic Lupus Erythematosus with Uveitis*, 133 JAMA Ophthalmology 1190 (2015), attached hereto as Exhibit 5.

[7] CK Lee et al., *Acute Abdominal Pain in Systemic Lupus Erythematosus*, 61 Ann. Rheum. Dis. 547, 547 (2002), attached hereto as Exhibit 6.

[8] Ziv Paz*, Lupus*, American College of Rheumatology (Mar. 2017), https://www.rheumatology.org/I-Am-A/Patient-Caregiver/Diseases-Conditions/Lupus (last visited January 9, 2019), attached hereto as Exhibit 7.

[9] Exhibit 3, Panjwani, *supra* fn. 4 at 206.

[10] *Id*.

[11] *Id*.

chart outlines each symptom of SLE that Kelly experienced and the dates on which his Army medical records indicate he exhibited the symptoms:

| Kelly's SLE Symptoms | Date |
| --- | --- |
| Fatigue | 6/23/03, 7/28/04, 9/26/04, 9/30/04, and 10/18/04 |
| Joint pain, stiffness and swelling | 1/28/04, 2/12/04, 3/17/04, and 9/30/04 |
| Butterfly or Malar Rash | 5/30/03, 6/9/03, 6/12/03, 8/3/03, 8/17/03, 8/25/03, 1/23/04, 1/27/04, 2/5/04, 3/17/04, 7/3/04, 7/28/04, 8/2/04, 9/1/04, 9/26/04, 9/30/04, 10/12/04, and 10/18/04 |
| Photosensitivity | 6/27/03, 1/27/04, 1/28/04, 2/5/04, 3/2/04, 3/17/04, and 7/28/04 |
| Fingers turning purple when exposed to cold temperatures | 9/30/04 |
| Chest or Abdominal Pain | 7/28/04, 10/12/04, 10/18/04, 12/9/04, 12/13/04, 12/30/04, and 2/11/05 |
| Headaches or migraines | 5/30/03, 8/17/03, 9/24/03, 1/23/04, 1/27/04, 2/5/04, 3/2/04, 3/17/04, 9/30/04, 12/30/04, and 1/10/05 |
| Hair loss | 1/28/04, 3/17/04, and 9/30/04 |
| Pleural Effusion | 2/16/05 |
| Positive ANA Test | 1/27/04 |
| Uveitis | 7/28/04, 9/30/04, and 12/30/04 |

All of the medical records referenced in the above chart date from before the PEB rendered its decision that DLE was the appropriate diagnosis.  Put another way, all of this information was available to the PEB when it made its decision.

29.     When an Army service member of Kelly's era left the military, his or her service medical records were sent to the Department of Veterans Affairs, and the VA served as record-keeper.[12]

**The Army Physical Disability Evaluation System**

30.     When a military branch determines that a service member has one or more disabilities that make the member unfit for continued military service, he or she is normally separated from service with either a (1) medical separation, or (2) medical retirement.  Whether a service member is medically separated or retired is contingent on the combined disability rating that the military department assigns them based on the conditions that render the service member unfit for continued service.  In assigning a disability rating, the military department is required by statute to apply the VA Schedule for Rating Disabilities ("VASRD") (38 C.F.R. Part IV).  If the military department assigns the service member a combined disability rating of less than 30%, the service member is medically separated.  If the military department assigns the service member a combined disability rating of 30% or more, the service member is medically retired.  If the service member is medically retired, he or she is entitled to military health care (TRICARE) for the retiree, the retiree's spouse, and the retiree's minor children, as well as access to military bases and commissary privileges, among other things.

31.     Chapter 61 of Title 10 of the United States Code establishes the process through which the Army discharges disabled service members.  It authorizes a Physical Evaluation Board to discharge military personnel who are found to be unfit for continued military service due to physical or mental disability.

---

[12] Veterans' Service Records, *Veterans' Medical and Health Records*, National Archives, https://www.archives.gov/veterans/military-service-records/medical-records.html (last visited January 9, 2019), attached hereto as Exhibit 8.

32.     The discharge process begins with a Medical Evaluation Board ("MEB"). The decision to begin proceedings before the MEB rests entirely with the Army.  A service member may not refer himself to a MEB.  The purpose of the MEB is to document a service member's medical status and duty limitations and determine whether he or she meets the Army's retention standards.  The MEB evaluates the service member through a series of examinations.  If the MEB determines that the service member has one or more physical or mental conditions that fall below retention standards, it refers the service member to a Physical Evaluation Board ("PEB") for a fitness determination.

33.     A PEB is responsible for determining a service member's unfitness for duty as a result of a physical or mental disability.  A PEB can find unfitness only when a disability rises to the level of interrupting a service member's career.  If the PEB finds a service member is unfit for duty, then it must assign a percentage disability rating from 0% to 100%, in increments of 10%, for each condition.  A PEB's disability rating controls the amount of military benefits and services to which the service member is entitled upon discharge.

34.     If the PEB finds a service member unfit for duty, with a disability rating of lower than 30%, the service member is medically separated, but is not medically retired.  In this case the service member receives a one-time lump sum severance payment, but is not eligible for the other privileges associated with medical retirement, listed below in paragraph 31.

35.     A service member with unfitting conditions rated at a combined level of 30% or higher is eligible for medical retirement status.  *See* 10 U.S.C. § 1201.  A medical retiree is entitled to medical care, including spousal and dependent health insurance coverage through Tricare, access to base facilities including commissary privileges, the right to wear the uniform on appropriate public occasions, space available travel on military aircraft, disability retirement

10

pay, military funeral arrangements, and burial privileges in national cemeteries. In addition, medical retirees retain an honored status within the military community not afforded to individuals who have been medically separated.   That honored status brings with it the opportunity to maintain strong social ties with both active duty personnel and other military retirees.

36.     A service member may ask the PDBR, an independent board, to reassess the PEB's decision if he or she received a disability rating that does not adequately reflect the medical conditions that rendered them unfit for continued service.   Congress established the PDBR in 2008 under the Dignified Treatment of Wounded Warriors Act to, where appropriate, correct unjustifiably low disability ratings awarded since 2001.   The PDBR was created in large part because the Veterans' Disability Benefits Commission reported that the military departments frequently assigned lower disability ratings than the VA did to the same service member, for the same medical conditions, under the same disability rating criteria (the VASRD). The Chairman of the Veterans' Disability Benefits Commission even testified at a joint congressional hearing that the "DoD has strong incentive to assign ratings less than 30 percent so that only separation pay is required and continuing family health care is not provided."   *See* Hearing to Receive Testimony on the Department of Defense and Veterans Affairs Disability Rating Systems and the Transition of Servicemembers from the Department of Defense to the Department of Veterans Affairs, S. Hrg. 110-212 (Apr. 12, 2007), at 104.

## The Physical Evaluation Board's Unfounded Decision

37.     On February 25, 2005, notwithstanding the many SLE symptoms demonstrated in his service medical records detailed above, the PEB incorrectly determined that Kelly suffered

only from DLE and an undifferentiated connective tissue disease[13] rather than finding that he suffered from the much more severe disease, SLE.  As part of its deliberation process, the PEB considered Kelly's condition as described in his medical records, including an assessment made by the MEB on December 30, 2004. The MEB's assessment detailed Kelly's history of symptoms, which included: (1) severe headaches and migraines, (2) abdominal pain, (3) positive ANA test, (4) uveitis, (5) inflammatory reaction in his liver (cause undetermined), (6) hepatic and prostate cysts, (7) a diaphragmatic hernia and (8) skin lesions on Kelly's face.  Although the MEB diagnosed Kelly with DLE without even mentioning the possibility of SLE, all of these symptoms are consistent with an SLE diagnosis.  More telling, DLE alone does not explain the symptoms that involved Kelly's internal organs (*e.g*., inflamed liver and hepatic and prostate cysts).

38.     The PEB applied the VA Schedule of Rating Disabilities ("VASRD")[14] to the diagnosis of DLE and assessed Kelly's disability rating at 10%.  He was thus medically separated from the Army with a lump-sum severance payment. The PEB's assessment was erroneous.  The PEB should have determined that Kelly suffered from SLE, which would have

---

[13] The term "undifferentiated connective tissue disease" is "used to describe a condition in people who have symptoms and lab test results that indicate a systemic autoimmune disorder or connective tissue disease, but which do not meet enough such characteristics to indicate a diagnosis for a well-defined connective tissue disease such as rheumatoid arthritis, systemic lupus erythematosus (lupus) or scleroderma."  Dr. Jessica R. Berman*, Undifferentiated Connective Tissue Disease – In-Depth Overview*, Hospital for Special Surgery (Jul. 2017), https://www.hss.edu/conditions_undifferentiated-connective-tissue-disease-overview.asp (last visited February 7, 2019),

[14] The PEB applied Diagnostic Code 7809-7806 (Discoid Lupus Erythematosus Involving the Face).

led to a disability rating under the VASRD of at least 60%,[15] entitling him to a medical retirement.

## VA Medical Records & Rating Decisions

39.     At the time the PDBR reviewed Kelly's case, his VA medical record contained multiple diagnoses of SLE, including one diagnosis issued *less than five months* following his medical separation from the Army.  These diagnoses demonstrate that (i) the PEB decision was not supported by substantial evidence, given that a medical doctor faced with a nearly identical medical record diagnosed Kelly with SLE less than five months after his medical separation, and (ii) the PDBR acted arbitrarily and capriciously by not waiting to receive Kelly's VA Records before it affirmed the PEB's erroneous decision.

40.     On August 15, 2005, Dr. James P. Lawrence diagnosed Kelly with SLE.  Dr. Lawrence noted that Kelly exhibited the following SLE symptoms: (1) fatigue, (2) headaches, (3) swollen feet and joint pain, (4) persistent pleural effusion, and (5) facial malar rash.  Kelly's VA medical record includes a copy of Dr. Lawrence's SLE diagnosis.

41.     On February 15, 2007, Kelly received a second SLE diagnosis from Dr. Samy K. Metyas, who attributed Kelly's Pleuritis and chronic fatigue to his SLE condition, and re-diagnosed the Undifferentiated Connective Tissue Disease diagnosis from Kelly's time of service as SLE.  On May 1, 2008, Kelly received a third SLE diagnosis from Dr. Meika A. Fang at the Pasadena Primary Care Clinic.

42.     On August 29, 2012, Kelly received a fourth SLE diagnosis from Dr. Rajeswari Kumar.  Dr. Kumar noted that Kelly's condition began in 2003.

---

[15] 38 C.F.R. § 4.88b establishes that Diagnostic Code 6350 or SLE "with frequent exacerbations, producing severe impairment of health" should be rated at 100%, and SLE with "[e]xacerbations lasting a week or more, 2 or 3 times per year" should be rated at 60%.

43.     On January 29, 2013, the compensation and benefits arm of the VA finally acknowledged what the VA healthcare system had known since August 2005: that Kelly suffers from SLE.   Undoubtedly, Kelly having been medically separated (and thus not provided health insurance) made obtaining the VA's recognition of his SLE diagnosis, all the more difficult. Kelly was moved from one medical care provider to the next in the years following his discharge.   For Kelly, who was already suffering significant mental health issues from Posttraumatic Stress Disorder, this inconsistent medical coverage caused him overwhelming stress and uncertainty.   Overcome by the uphill battle he faced, it took Kelly years to navigate the VA benefits system.

44.     If the PDBR had waited to evaluate Kelly's case until it obtained the records held by the VA, it would have been aware of all four of these SLE diagnoses from certified medical professionals, one of which took place *within five months* of his discharge from the Army.   It would also have been aware of the VA award of service-connection for Kelly's SLE.   Each of these diagnoses provide strong evidence that Kelly's SLE symptoms were misdiagnosed as Undifferentiated Connective Tissue Disease during his time of service, and that Kelly suffered from an extremely serious autoimmune disease, SLE, at the time of his assessment by the PEB and his discharge from the Army.

**Physical Disability Board of Review – Arbitrary and Capricious Decision**

45.     On October 25, 2013, Kelly submitted his DD Form 294 application to the PDBR, asking it to reassess the PEB's 2005 decision and award him a medical retirement.

46.     On August 22, 2014, Kelly received a letter from Chief Ray Diaz of PDBR Intake Operations in Randolph Air Force Base, Texas, informing Kelly of significant delays in processing his application related to collecting records required for the PDBR's review,

including "copies of [his] complete service treatment records from the Department of Veterans Affairs to include relevant examinations and rating decisions they created."

47.     On July 25, 2015, the PDBR issued its decision, upholding the PEB's 10% disability rating and noting "that there was insufficient cause to recommend a change in the PEB adjudication for the DLE condition."    That decision admitted that "[n]either the VA compensation and pension examination nor the VA rating decision proximate to separation were available for review . . . [t]he Board adjudicated the case based on the available evidence" which the Board noted was "scant".[16]    It is unclear exactly what "available evidence" made up the "scant" record reviewed by the Board in considering Kelly's case.  However, the PDBR itself acknowledged the available documents were so limited that the Board pulled "the majority of the history…from the narrative summary (NARSUM) which was dated 30 December 2004" rather than reviewing Kelly's actual underlying medical records.

48.     On August 24, 2015, Kelly received a letter from Francine C. Blackmon of the Army Review Boards Agency enclosing the PDBR's decision and indicating she had "reviewed the Board's recommendation and record of proceedings" and "accept[ed] its recommendation." Blackmon also stated the "decision is final" and "[r]ecourse within the Department of Defense or the Department of the Army is exhausted".

49.     Department of Defense Instruction 6040.44 requires that "[f]or each case referred to the PDBR, the PDBR will review the complete case record that served as the basis for the

---

[16] The complete VA claims file, which contains Kelly's service medical records, is over three thousand pages.

final Military Department PEB rating determination and, to the extent feasible, collect all the information necessary for competent review and recommendation."[17]

50.     The "case record that served as the basis for the final Military Department PEB rating determination" means Kelly's service medical records.  As discussed in paragraph 25, for someone of Kelly's service era, these service medical records are in the possession of the VA. The Diaz letter of August 22, 2014 admits that Kelly's "service treatment records" were being requested from the VA.  It is unclear whether the PDBR ever obtained Kelly's full service medical records from the VA.  However, the PDBR's admissions that it never received the VA compensation and ratings decisions, and  that the record was "scant" and that the Board relied on "narrative summary" in its analysis, all strongly bely that the PDBR ever received the entirety of Kelly's service medical records.

51.     Moreover, the regulation's reference to "all the information necessary for competent review and recommendation" acknowledges that there is information *in addition to* the "complete case record that served as the basis for the . . . PEB" decision that should be obtained if "feasible."  In this case, the Diaz letter of August 22, 2014 makes clear that the PDBR had requested, was waiting for, and thus considered Kelly's "relevant examinations and rating decisions [the VA] created" as evidence "necessary for competent review."

52.     The PDBR website further underscores the importance of VA records (*i.e.*, VA medical examinations, VA rating decisions, and service medical records housed in a veteran's VA claims file) to PDBR decision making.  The website sets out the PDBR's position that VA

---

[17] DoD Instruction 6040.44, Physical Disability Board of Review (PDBR) at 12 (July 2, 2015), http://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodi/604044p.pdf?ver=2017-12-04-074059-830 (last visited January 9, 2019), attached hereto as Exhibit 1.

records are "instrumental to the PDBR's review process and greatly facilitate making any revision to the original disability rating."[18]

53.    Here, there was no statement by the PDBR that it was not "feasible" to wait for and obtain Kelly's VA records.  Indeed, Kelly's counsel was able to obtain a copy of his VA claims file and records from various VA medical centers by making routine record requests.[19]

54.    Notwithstanding the applicable regulation requiring the PDBR to "collect all the information necessary for competent review," and notwithstanding the PDBR's position that VA records are "required" and "instrumental," the PDBR made a final determination on Kelly's case without first reviewing Kelly's VA records.  The PDBR did not contend that it was unfeasible to obtain such records, as the regulation requires; it just went ahead without them without any explanation.  This was arbitrary and capricious.

55.    If the PDBR had followed its own procedures and "collect[ed] all the information necessary for competent review and recommendation,"[20] then the PDBR would have considered Kelly's multiple SLE diagnoses, including that of Dr. Lawrence less than five months after Kelly's discharge from the Army.  The Board would have also reviewed Kelly's full service medical records, which contain ample evidence that Kelly suffered from SLE during his time of service (as described in paragraphs 25 – 29 above), rather than relying on "narrative summary" of prior medical history.  But the PDBR did not wait to review any of Kelly's VA records. Instead, the PDBR arbitrarily and capriciously ignored its own protocols and procedures and reviewed Kelly's case with only a fraction of the documentary record in its possession.  As a

---

[18] Military Health System, *Physical Disability Board of Review*, https://health.mil/Frequently-Asked-Questions/Physical-Disability-Board-of-Review (last visited January 9, 2019), attached hereto as Exhibit 9.
[19] Correspondence with the VA and the National Personnel Records Center are attached hereto as Exhibit 10.
[20] Exhibit 1, DoD Instruction 6040.44 at 12.

result of this arbitrary and capricious decision, the PDBR did not see all relevant evidence supporting an SLE diagnosis, the PEB's incorrect 10% disability rating for DLE was upheld, and Kelly's discharge status was not changed to medical retirement.

## COUNT I – ADMINISTRATIVE PROCEDURE ACT (5 U.S.C. § 702 et seq.)

56.     Plaintiff incorporates the allegations in paragraphs 1 through 55 above.

57.     The PDBR arbitrarily and capriciously disregarded its own procedures found in DoDI 6040.44, Enclosure 3, Paragraph 5(a)(4), by making a final determination with respect to Kelly's discharge disability rate without reviewing his VA record.

58.     As stated above, it is unclear what amount, if any, of Kelly's service medical records the PDBR obtained and reviewed.  To the extent the PDBR did review a portion of these records, it erred additionally because it ignored extensive evidence within Kelly's service medical records demonstrating that Kelly suffered from SLE and not merely DLE at the time he left the Army.  This rendered its decision unsupported by substantial evidence.

59.     Kelly has suffered a legal wrong as a result of the PDBR's arbitrary and capricious decision because he was deprived of his right to a meaningful review from the PDBR. The PDBR's hasty review and incorrect decision caused Kelly to remain with the stigma of medical separation from the Army.  Being medically separated requires Kelly to constantly justify the circumstances of his discharge, and greatly diminishes his opportunities to engage with the military community.  In doing so, the Army has deprived Kelly of the discharge status that his serious disability and honorable service warrant—medical retirement.

60.     Kelly served his country honorably.  He received numerous service commendations, volunteered to serve our country in a time of great need, and risked his life to assist the Army in dangerous and important operations.

61.     Kelly views his military experiences with fondness and cherishes the relationships he formed with his fellow servicemen.  If Kelly were a medical retiree, rather than a serviceman who was medically separated, he would enjoy the benefit of frequenting his local Army base and thus be able to maintain close social ties to the military community.  Kelly would also be able to proudly wear his military uniform to appropriate public functions, enjoy the convenience and association of space available travel on military aircraft, and his family would have the immense honor of military funeral arrangements when that day comes.  He also aspires to write about his military experiences with the status of a dignified medical retiree who is still engaged in the military community.   Kelly's earnest hopes have thus far been thwarted as a result of the PDBR's arbitrary and capricious decision.

62.     The PDBR exists to correct injustices by ensuring "the accuracy and fairness of combined disability ratings."[21]  The PDBR did not follow through on that mission in this case. Only awarding Kelly medical retirement status would correct the injustice caused by the PDBR's incorrect decision.   Kelly already faces many challenges because of his severe medical disabilities.  Recognizing that Kelly should have been medically retired and not medically separated is a clear remedy that will give him the stature and benefits that flow from retiree status, including but not limited to greater opportunities to build his relationships in the military community.

**PRAYER FOR RELIEF**

Daniel P. Kelly respectfully requests that this Court enter judgment against Defendants and award the following relief:

---

[21] *Id.* at 1.

a.      Issuance of an order by this Court requiring Defendants to Increase Kelly's disability rating to reflect Kelly's SLE diagnosis and amend his Army records—including without limitation his DD Form 214 and discharge orders—to reflect a medical retirement;

b.      Award Plaintiff costs and attorneys' fees; and

c.      Grant any other relief the Court deems proper.


Dated:  February 8, 2019                              Respectfully submitted,


                                                     /s/ Richard E. Young

                                                     Richard E. Young (SBN 298547)
                                                     ryoung@sidley.com
                                                     SIDLEY AUSTIN LLP
                                                     1501 K. Street, N.W. #600
                                                     Washington, D.C. 20005
                                                     Telephone: (202) 736-8000
                                                     Facsimile: (202) 736-8711

                                                     J. Ryan Stasell (*Pro Hac Vice pending;* CA
                                                     SBN 307431)
                                                     rstasell@sidley.com
                                                     Katelyn N. Rowe (*Pro Hac Vice pending;*
                                                     CA SBN 318386)
                                                     krowe@sidley.com
                                                     SIDLEY AUSTIN LLP
                                                     1999 Avenue of the Stars, 17th Floor
                                                     Los Angeles, CA 90067
                                                     Telephone: (310) 595-9500
                                                     Facsimile: (310) 595-9501

**EXHIBIT 1**



# Department of Defense
# INSTRUCTION

**NUMBER** 6040.44
July 2, 2015
*Incorporating Change 1, December 4, 2017*

USD(P&R)

SUBJECT:    Physical Disability Board of Review (PDBR)

References:   See Enclosure 1

1. <u>PURPOSE</u>.  This instruction:

  a.  Reissues DoD Instruction (DoDI) 6040.44 (Reference (a)) in accordance with the authority in DoD Directive (DoDD) 5124.02 (Reference (b)) to establish policies, assign responsibilities, and provide procedures for PDBR operation and management as required by section 1554a of Title 10, United States Code (Reference (c)).

  b.  Designates the Secretary of the Air Force as the lead agent for the establishment, operation, and management of the PDBR for DoD.

2. <u>APPLICABILITY</u>.  This instruction applies to OSD, the Military Departments, the Office of the Chairman of the Joint Chiefs of Staff and the Joint Staff, the Combatant Commands, the Office of the Inspector General of the Department of Defense, the Defense Agencies, the DoD Field Activities, and all other organizational entities within the DoD (referred to collectively in this instruction as the "DoD Components").

3. <u>POLICY</u>.  It is DoD policy that:

  a.  The PDBR will reassess the accuracy and fairness of the combined disability ratings assigned former Service members who:

    (1)  Were separated, with a combined disability rating of 20 percent or less during the period beginning on September 11, 2001, and ending on December 31, 2009, due to unfitness for continued military service, resulting from a physical disability as described in chapter 61 of Reference (c); and

    (2)  Were not found to be eligible for retirement, including former Reserve Component Service members with 20 satisfactory years.

b.  The PDBR will review the combined disability ratings assigned to individuals who meet the criteria in paragraph 3a (referred to in this instruction as "covered individuals").  Review may be upon the covered individual's request or the PDBR's own initiative.  Where appropriate, the PDBR will recommend that the Military Departments correct discrepancies and errors in such ratings.

c.  The PDBR will review covered individuals' appeals pertaining to conditions identified but not determined to be unfitting by the physical evaluation board (PEB) of the Military Department concerned, when contended by the applicant.

d.  The PDBR will operate in a transparent and accountable manner.  The PDBR has no greater obligation to wounded, ill, and injured former Service members than to offer fair and equitable recommendations pertaining to the assignment of disability ratings.

e.  Performance and production metrics will be considered in the determination of resource requirements.  Resources for implementing the PBDR must be identified and allocated as part of the Defense Planning, Programming, Budgeting, and Execution process by the Military Departments.

f.  Scheduling of cases subject to review by the PDBR will be based upon an intentional methodology that gives equitable consideration to requests originating from covered individuals regardless of status, component affiliation, or source of disability.

g.  The PDBR will support the disability evaluation system (DES) in accordance with DoDI 1332.18 (Reference (d).

4.  <u>RESPONSIBILITIES</u>.  See Enclosure 2.

5.  <u>PROCEDURES</u>.  See Enclosure 3.

6.  <u>RELEASABILITY</u>.  **Cleared for public release**.  ~~This instruction is available on the Internet from the DoD Issuances Website at http://www.dtic.mil/whs/directives.~~ *This instruction is available on the Directives Division Website at http://www.esd.whs.mil/DD/.*

*DoDI 6040.44, July 2, 2015*

7. <u>EFFECTIVE DATE</u>.  This instruction is effective July 2, 2015.

Brad Carson
Acting Under Secretary of Defense
for Personnel and Readiness

Enclosures
    1. References
    2. Responsibilities
    3. Procedures
Glossary

<u>TABLE OF CONTENTS</u>

ENCLOSURE 1:  REFERENCES................................................................................................5

ENCLOSURE 2:  RESPONSIBILITIES....................................................................................6

   UNDER SECRETARY OF DEFENSE FOR PERSONNEL AND READINESS
     (USD(P&R))...........................................................................................................................6
   ASSISTANT SECRETARY OF DEFENSE FOR HEALTH AFFAIRS (ASD(HA))..............6
   UNDER SECRETARY OF DEFENSE (COMPTROLLER) / CHIEF FINANCIAL
     OFFICER, DEPARTMENT OF DEFENSE (USD(C)/CFO)...........................................6
   SECRETARIES OF THE MILITARY DEPARTMENTS......................................................6
   SECRETARY OF THE AIR FORCE......................................................................................7

ENCLOSURE 3:  PROCEDURES...............................................................................................9

   GENERAL................................................................................................................................9
   MOTION TO REVIEW...........................................................................................................9
   ORGANIZATION AND DUTIES..........................................................................................9
   ADMINISTRATION..............................................................................................................11
   TIMELINE GOALS...............................................................................................................13
   CORRECTION OF MILITARY RECORDS........................................................................13
   CONSISTENCY REVIEWS.................................................................................................14

GLOSSARY ................................................................................................................................15

   PART I:  ABBREVIATIONS AND ACRONYMS ..............................................................15
   PART II:  DEFINITIONS......................................................................................................15

*DoDI 6040.44, July 2, 2015*

ENCLOSURE 1

REFERENCES

(a)   DoD Instruction 6040.44, "Lead DoD Component for the Physical Disability Board of Review (PDBR)," June 27, 2008, as amended (hereby cancelled)

(b)   DoD Directive 5124.02, "Under Secretary of Defense for Personnel and Readiness (USD(P&R))," June 23, 2008

(c)   Title 10, United States Code

(d)   DoD Instruction 1332.18, "Disability Evaluation System," August 5, 2014

(e)   "Physical Disability Board of Review Charter," November 1, 2012[1]

(f)   DoD 7000.14-R, Volume 11A, "DoD Financial Management Regulation:  Reimbursable Operations Policy," July 2013

(g)   DoD Instruction 4000.19, "Support Agreements," April 25, 2013

(h)   DoD Instruction 5015.02, "DoD Records Management Program," February 24, 2015*, as amended*

(i)   DoD Instruction 5100.73, "Major DoD Headquarters Activities," December 1, 2007, as amended

(j)   DoD Instruction 8910.01, "Information Collection and Reporting," May 19, 2014

(k)   DoD Manual 1332.18, Volume 3, "Disability Evaluation System (DES) Manual:  Quality Assurance Program," November 21, 2014

(l)   DoD Directive 5400.11, "DoD Privacy Program," October 29, 2014

(m)   DoD 5400.11-R "Department of Defense Privacy Program," May 14, 2007

(n)   Part 4 of Title 38, Code of Federal Regulations (also known as the "Department of Veterans Affairs Schedule for Rating Disabilities (VASRD)")

(o)   DoD Manual 1332.18, Volume 1, "Disability Evaluation System (DES) Manual:  General Information and Legacy DES Timelines," August 5, 2014

---

[1] Copies may be obtained from the Internet at http://warriorcare.dodlive.mil/files/2014/12/Signed-PDBR-Gov-by-PR-16May13.pdf

ENCLOSURE 2

RESPONSIBILITIES

1. UNDER SECRETARY OF DEFENSE FOR PERSONNEL AND READINESS (USD(P&R)).  The USD(P&R):

   a. Establishes policy for the PDBR and oversees implementation of this instruction, pursuant to the authority delegated in Reference (b).

   b. Appoints a Director for the PDBR (referred to as "the PDBR President" in this instruction), as nominated by the lead agent.

   c. Delegates the PDBR Executive Oversight Committee chairperson position to the Principal Deputy Under Secretary of Defense for Personnel and Readiness; in accordance with the PDBR Charter (Reference (e)).


2. ASSISTANT SECRETARY OF DEFENSE FOR HEALTH AFFAIRS (ASD(HA)).  Under the authority, direction, and control of the USD(P&R), the ASD(HA):

   a. Establishes procedures to detail specialty medical members to the PDBR, as requested by the PDBR President, to provide medical advisory opinions and recommendations.

   b. Issues PDBR policy updates as necessary for its effective operation and management.

   c. Develops procedures to conduct DES Quality Assurance Program (QAP) as related to the PDBR.

   d. Participates as a voting member of the PDBR Executive Oversight Committee in accordance with Reference (e).


3. UNDER SECRETARY OF DEFENSE (COMPTROLLER)/CHIEF FINANCIAL OFFICER, DEPARTMENT OF DEFENSE (USD(C)/CFO).  The USD(C)/CFO will include financial requirements for implementation of this instruction in the DoD Component budgets for the PDBR.


4. SECRETARIES OF THE MILITARY DEPARTMENTS.  The Secretaries of the Military Departments:

   a. Comply with chapter 61 of Reference (c), this instruction, and any implementing guidance.

b.  Implement the procedures and processes established by the lead agent to meet the information requirements prescribed in paragraph 5i of this enclosure and paragraph 5a of Enclosure 3 of this instruction.

c.  Develop procedures to inform, assist, and cooperate with former Service members in forwarding requests to the PDBR.  Compile the records and information required by the PDBR or requested by the individuals covered by section 2 of Enclosure 3 of this instruction, including any applicable Department of Veterans Affairs (VA) disability ratings.

d.  Establish procedures to obtain written agreement from individuals covered by section 2 of Enclosure 3 of this instruction acknowledging that:

(1)  As a result of requests for PDBR review, the covered individual or a surviving spouse, next of kin, or legal representative may not seek relief from the Board for Correction of Military Records operated by the Secretary of the Military Department concerned.

(2)  The recommendation of the PDBR, once accepted by the respective Military Department, is final.

e.  Plan, program, and budget for review of cases of covered members of their respective Departments, according to the procedures prescribed by Chapter 1, Volume 11A of DoD 7000.14-R (Reference (f)) and DoDI 4000.19 (Reference (g)).

f.  Provide representatives to the PDBR as required and requested by the lead agent, subject to the procedures in Enclosure 3 of this instruction.

g.  Comply with the standards and processes in Enclosure 3 of this instruction, and those subsequently published under the authority of the lead agent.

h.  Develop procedures to distribute DES quality assurance constructed cases for adjudication.

5.  <u>SECRETARY OF THE AIR FORCE</u>.  In addition to the responsibilities in section 4 of this enclosure and as the lead agent for the establishment, operation, and management of the PDBR for the DoD, the Secretary of the Air Force:

a.  Acts as the single point of contact for the DoD to establish the operational relationships, capabilities, and system integration necessary for effective and efficient operation of the PDBR.

b.  Organizes the PDBR, with representation from each of the Military Departments, and comply with section 1554a of Reference (c).

c.  Operates the PDBR under the policy direction of the ASD(HA), in accordance with DoDI 5015.02, DoDI 5100.73, and DoDI 8910.01 (References (h), (i), and (j), respectively).

    d.  Nominates the PDBR President for appointment by the USD(P&R).  The PDBR President must be an O-6 line officer or an equivalent-grade government civilian employee, and will possess high professional qualifications and demonstrated knowledge of the disability evaluation process.

    e.  Programs, obtains, and provides necessary administrative and operational resources to establish and support PDBR operations.

    f.  Delineates roles, responsibilities, and authorities among the organizations and elements that participate in or support the PDBR, including, but not limited to, DoD Components and the VA.

    g.  Establishes the operational and administrative relationships necessary to operate, publicize, and receive applications for the PDBR.  Establishes the standard format for packaged records forwarded to the PDBR for review.

    h.  Publishes operating procedures that comply with Reference (d) and Volume 3 of DoD Manual (DoDM) 1332.18 (Reference (k)) and implements the procedures in Enclosure 3 of this instruction.

    i.  Determines the information required for review of cases by the PDBR.  Such information may include, but is not limited to:

        (1)  The complete record of medical and non-medical material and evidence contained in the former Service member's PEB records that served as the basis for the original determination of unfitness and disability rating(s) assigned;

        (2)  Rating determinations by the VA, as applicable to the case under review; and

        (3)  New or newly discovered evidence not previously included in official records.

    j.  Complies with the procedures for the collection, storage, and release of information required by the PDBR as described in Enclosure 3 of this instruction.

        (1)  The procedures will be established in collaboration with the Military Departments and the VA, and will be in accordance with Reference (i).

        (2)  The lead agent will ensure the collection, maintenance, dissemination, and use of personally identifiable information is in accordance with the requirements of DoDD 5400.11 and DoD 5400.11-R (References (l) and (m), respectively).

        (3)  The lead agent will assess the operations and results of the PDBR, including a review of resources and provide a fiscal year report to the USD(P&R) no later November 30 of each year.

ENCLOSURE 3

PROCEDURES

1. GENERAL.  The PDBR:

    a.  In accordance with section 3 of this enclosure, will review the combined disability ratings of individuals covered by section 2 of this enclosure.

    b.  As part of its review, may, at the request of an eligible member as described in Reference (c), review conditions identified but not determined to be unfitting by the PEB of the Military Department concerned.

2. MOTION TO REVIEW.  The PDBR may, upon its own motion, review the findings and decisions of the PEB with respect to a covered individual.

    a.  If the PDBR proposes to review, upon its own motion, the findings and decisions of the PEB, the PDBR will notify the covered individual or a surviving spouse, next of kin, or legal representative of the covered individual of the proposed review and obtain the consent of the covered individual or a surviving spouse, next of kin, or legal representative of the covered individual before proceeding with the review.

    b.  Cases may be considered and presented to the PDBR upon completion of DD Form 294, "Application for a review by the PDBR of the rating awarded accompanying a medical separation from the Armed Forces of the United States," by the covered individual, or by his or her surviving spouse, next of kin, or legal representative.  The DD Form 294 is available at http://www.dtic.mil/whs/directives/infomgt/forms/eforms/dd0294.pdf and the instructions for completing the form are on page 3 of the form.

3. ORGANIZATION AND DUTIES.  The PDBR will be composed of military or senior career civilian members in the grade equivalent of O-5 or O-6, appointed by the Secretary of the Military Department that they represent.

    a.  The PDBR will consist of at least one member from each of the Military Departments. Upon the request of the lead agent, additional PDBR members will be appointed by the Secretaries of the Military Departments.

    b.  When in session and considering the case of a covered individual, the PDBR will be composed of three voting members.

      (1)  No voting member of the PDBR may have a personal interest in, or have been a member of another board that ever considered, the case under review.

(2)  When the covered individual was a member of the Reserve Component, one voting member of the PDBR will be from the Reserve Component.

(3)  A non-voting military medical officer, a non-voting legal advisor, and a VA advisor familiar with the application of part 4 of Title 38, Code of Federal Regulations (Reference (n)) may be invited to provide advice to the PDBR.

c.  The PDBR President will:

(1)  Notify the covered individual that the PDBR has begun to review the case after receipt of either the review request or the consent to review described in section 3 of this enclosure.

(2)  Advise the covered individual of the final and non-appealable nature of the review, as described in paragraph 4c of Enclosure 2 of this instruction.

d.  The PDBR will review the PEB record of findings and the combined disability rating decisions regarding the specific military unfitting medical conditions with respect to the covered individual.  The review will be based on the records of the Military Department concerned and such other evidence as may be presented to the PDBR, in accordance with the information requirements prescribed in paragraph 5i of Enclosure 2 of this instruction.

e.  The Department of Veterans Affairs Schedule for Rating Disabilities (VASRD) in effect at the time the covered individual's disability rating was assigned will be used for recommendations, along with all applicable statutes, and any directives in effect at the time of the contested separation (to the extent they do not conflict with the VASRD in effect at the time of the contested separation).

f.  The PDBR will make one of the following recommendations to the Secretary of the Military Department concerned for each case reviewed with respect to a covered individual:

(1)  Do not re-characterize the separation of such covered individual or modify the combined disability rating previously assigned such covered individual.

(2)  Re-characterize the separation of such covered individual to retirement for disability.

(3)  Modify the combined disability rating previously assigned such covered individual by the Military Department PEB.  This modified combined disability rating may not be a reduction of the disability rating previously assigned such covered individual by that PEB.

(4)  Issue a proposed new combined disability rating for such covered individual.  No reduction of the previously issued combined disability rating will result as a product of this review.

g.  If, upon review of the PDBR, the PDBR decides that a previous "not-unfit" determination of a medical condition by the PEB of the Military Department concerned should be changed to

"unfit," the PDBR will make the recommendation and assign a rating to that condition, which will be combined with the other disability rating(s).

    h.  Support the DES quality assurance process consistent with References (d) and (k).


4.  <u>ADMINISTRATION</u>.  The following minimum actions are required to operate the PDBR:

    a.  The Military Departments will obtain records and other information required for review of cases by the PDBR.

        (1)  Evidence to be reviewed by the PDBR will be primarily documentary in nature.

        (2)  All new or newly discovered records or other relevant evidence gathered and considered by the PDBR will be made a part of the covered individual's PEB records.

        (3)  A witness may present evidence to the PDBR by affidavit or by any other means considered acceptable by the PDBR President.

        (4)  If the former Service member indicates that a VA disability award has been made, he or she will be requested to provide a copy of the VA determination letter and sign a release form authorizing the PDBR access to the information.

        (5)  The Military Department concerned will obtain VA rating determinations issued on behalf of the former Service member.  Once obtained, the PDBR will:

            (a)  Compare any VA disability rating for the specifically military-unfitting condition(s) with the PEB combined disability rating; and

            (b)  Consider any variance in its deliberations and any impact on the final PEB combined disability rating, particularly if the VA rating was awarded within 12 months of the former Service member's separation.

    b.  The Military Departments will provide the lead agent with the:

        (1)  Medical records and non-medical documents that were reviewed and considered by the Military Department PEBs in making their final disability rating determinations.

        (2)  Documents detailing the final decisions of the Military Department PEBs.

        (3)  Documents or decisions subsequently issued on appeal(s), as requested by the lead agent for case review.

    c.  Any covered individual who petitions the PDBR will have no less than 2 weeks from notice of pending review to submit documentary evidence outside DoD possession.

d.  For each case referred to the PDBR, the PDBR will review the complete case record that served as the basis for the final Military Department PEB rating determination and, to the extent feasible, collect all the information necessary for competent review and recommendation.

e.  The PDBR President will obtain the advice and assistance of specialized medical authorities for cases involving specific medical disabilities, if needed.  Any assistance provided by these medical authorities will be documented in the covered individual's case.

f.  The PDBR will conduct reviews of the disability rating(s) of the covered individual in accordance with the VASRD in effect at the time of separation.

(1)  If the case was adjudicated by the Military Department PEB and the covered individual was separated from military service before January 28, 2008, the PDBR will review the disability rating(s) of the covered individual in accordance with the VASRD in effect at the time of the covered individual's separation.

(2)  Any DoD provisions, Military Department regulations, or guidelines inconsistent with the VASRD in effect at the time of the former Service member's separation will not be considered by the PDBR.

(3)  If the covered individual was separated from the military on or after January 28, 2008, the PDBR will use the VASRD in accordance with Enclosure 4, Volume 1 of DoDM 1332.18 (Reference (o)).

(4)  The following will be subject to review by the PDBR:

(a)  Medical conditions determined to be specifically unfitting for continued military service, as previously determined by the Military Department PEB.

(b)  Conditions identified but not determined to be unfitting by the Military Department PEB; as requested by the covered individual.

g.  The PDBR will:

(1)  Establish recommendations based on a majority vote of the board members.

(2)  Render recommendations, in a written report signed by the PDBR President and forwarded to the Secretary of the Military Department concerned, either to affirm or change the rating of the Military Department PEB being reviewed, in accordance with paragraph 3f of this enclosure.

h.  If the PDBR recommends a change to the covered individual's separation characterization or disability rating, the recommendation letter will contain a brief explanation of the rationale for such change.

*DoDI 6040.44, July 2, 2015*

i.  The lead agent will maintain statistical review data categorized by Military Department and component (Active Component or Reserve Component) of cases reviewed.  A key element of this statistical review will include an accounting of PDBR recommendations that were rejected by the Secretary of the Military Department.


5.  <u>TIMELINE GOALS</u>.  The timeline goals for the review, adjudication, and notification processes include:

a.  The PDBR will adjudicate and issue an appropriate recommendation report for 80 percent of cases within 105 calendar days of obtaining the necessary records.

b.  The Secretary of the Military Department concerned will accept or reject recommendations of the PDBR within 45 calendar days of receipt from the PDBR.

c.  The Secretary of the Military Department concerned will notify covered individuals of the Military Department's decision on the recommendation within 10 calendar days of the decision.


6.  <u>CORRECTION OF MILITARY RECORDS</u>.  The Secretary of the Military Department concerned:

a.  Will correct the military records of a covered individual in accordance with a recommendation made by the PDBR under paragraph 3f of this enclosure.  Any such correction will be made effective as of the date of the action taken on the report of the Military Department PEB to which such recommendation relates.

b.  May delegate, in writing, the decision authority for corrections no lower than:

(1)  For the Army and Air Force, to the directors of the review board agencies.

(2)  For the Navy, to the Assistant Secretary of the Navy (Manpower and Reserve Affairs).

c.  Shall ensure that,  in the case of a former Service member previously separated pursuant to the findings and decision of a Military Department PEB together with a lump sum or other payment of back pay and allowances at separation, the amount of pay or other monetary benefits to which the covered individual would be entitled, based on the member's military record as corrected, shall be reduced to take into account receipt of such lump sum or other payment.

d.  Will ensure that, if the PDBR makes a recommendation not to correct the military records of a covered individual, the action taken on the Military Department PEB's report to which such recommendation relates will be treated and recorded as final as of the date of such action.

e.  Will accept or reject, in whole or in part, the recommendation of the PDBR and will notify the covered individual of such decision.

    (1)  If the recommendation is accepted, the Secretary of the Military Department concerned will notify the covered individual of the result (medical retirement or separation with severance pay) and effective date of the acceptance of the recommendation.

    (2)  In those cases warranting a record change resulting from a rating increase or retirement, the Secretary of the Military Department concerned will notify the VA of the change.

7.  <u>CONSISTENCY REVIEWS</u>.  The PDBR will administer DES quality assurance consistency reviews in accordance with section 4 of Enclosure 2 of Reference (d).

# GLOSSARY

## PART I.  ABBREVIATIONS AND ACRONYMS

ASD(HA)       Assistant Secretary of Defense for Health Affairs


DES           disability evaluation system
DoDD          DoD directive
DoDI          DoD instruction
DoDM          DoD manual


PDBR          Physical Disability Board of Review
PEB           physical evaluation board


QAP           quality assurance program


USD(C)/CFO   Under Secretary of Defense (Comptroller)/Chief Financial Officer,
             Department of Defense
USD(P&R)     Under Secretary of Defense for Personnel and Readiness


VA            Department of Veterans Affairs
VASRD         Department of Veterans Affairs Schedule for Rating Disabilities


## PART II.  DEFINITIONS


These terms and their definitions are for the purposes of this instruction:

combined disability ratings.  Assignment of disability ratings are based on the VASRD as
implemented by References (n) and (o).  An individual with more than one unfitting condition
receives a disability percentage rating for each condition, which are then combined using the
"whole person concept" into a combined disability rating, as described in paragraph 4.25 of part
4 of Reference (n).  A rating of 30 percent for unfitting conditions in cases characterized as "in
line-of-duty" is required for medical retirement in accordance with chapter 61 of Reference (c).

consistency reviews.  Targeted reviews of specific issues, conditions, or high-level interest items
using constructed cases.  A review board, external to the Military Departments, will construct the
cases and evaluate PEB performance on the targeted policy issues within the constructed cases.

constructed cases.  Notional DES cases are created to simulate specific situations focusing on targeted policy issues; each includes distracting information to add realistic case evaluation conditions.

DES.  The DoD mechanism for determining return to duty, separation, or retirement of Service members because of disability in accordance with chapter 61 of Reference (c).

PEB.  A Military Department board of two or more civilian or military personnel, including at least one physician and one line officer, which determines the fitness of Service members with medical conditions to adequately perform their military duties.

physical disability

Any impairment due to disease or injury, regardless of degree, that reduces or prevents an individual's actual or presumed ability to engage in gainful employment or normal activity.

The term "physical disability" includes mental disease, but not such inherent defects as behavioral disorders, adjustment disorders (except Chronic Adjustment Disorders), personality disorders, and primary mental deficiencies.  A medical impairment or physical defect standing alone does not constitute a physical disability.

To constitute a physical disability, the medical impairment or physical defect must be of such a nature and degree of severity as to interfere with the member's ability to adequately perform his or her duties.

QAP.  An evaluation program designed to assess whether an organization performs work in accordance with established policy and procedures.

VASRD

The rating schedule in Reference (n) is primarily a guide in the evaluation of disability resulting from all types of diseases and injuries encountered as a result of or incident to military service.

The percentage ratings represent, as far as can be practicably determined, the average impairment in earning capacity resulting from such diseases and injuries and their residual conditions in civil occupations.

Generally, the degrees of disability specified are considered adequate to compensate for considerable loss of working time from exacerbations or illnesses proportionate to the severity of the several grades of disability.  For the application of this schedule, accurate and fully descriptive medical examinations are required, with emphasis upon the limitation of activity imposed by the disabling condition.

**EXHIBIT 2**

■ JAMA PATIENT PAGE

The Journal of the American Medical Association

AUTOIMMUNE DISORDERS

# Systemic Lupus Erythematosus

Systemic lupus erythematosus (SLE), also called **lupus**, is an **autoimmune disorder** in which the body's **immune system** (the cells in the body that fight infection) incorrectly attack the body's own tissues and organs, leading to inflammation and damage. Lupus most commonly affects women of childbearing age but also occurs in children, adolescents, and men. The cause of lupus is unknown, but it has been associated with genetic, environmental, and infectious causes. The disorder may affect almost all organs in the body, with the kidney being most commonly involved. The disorder may be mild in some cases (for example, only involving the skin) and very severe in other cases (affecting multiple organs, including the brain). The disease course is characterized by **flares** (intervals of active disease) and **remissions** (intervals of inactive disease). The June 22/29, 2005, issue of *JAMA* includes an article that describes the available treatments for the kidney disease associated with lupus.



"Butterfly" Rash

## SYMPTOMS

Because lupus can affect any organ of the body, it causes a wide range of symptoms. Some of the most common symptoms are

- Fatigue
- Fever (maximum temperature usually less than 102°F)
- Joint pain or swelling (most commonly in the hands, wrists, and knees)
- Muscle pain
- Hair loss
- Rash (typically in a "butterfly" distribution on the face, across the cheeks, and under the eyes)
- Painless ulcers in the mouth or nose
- **Photosensitivity** (the development of a rash on sun-exposed skin)

## DIAGNOSIS

In addition to a complete medical history and physical examination, your doctor will order blood tests to measure your **red blood cells** (cells that carry oxygen in the blood), **platelets** (important for blood clotting), and **white blood cells** (the cells of the immune system). Your doctor may also order blood tests to assess for any organ damage and to measure the extent of inflammation and autoimmune activity. Your doctor may refer you to a **rheumatologist** (a doctor with specialized training in autoimmune disorders).

## TREATMENT

There is no cure for lupus, but appropriate treatment can prevent or slow the disease process and control the associated symptoms. Lupus is treated with medications that target the body's immune system. Medication choices depend on the severity of disease and the specific organs involved. Additional medications may be prescribed for specific symptoms, such as joint pain, and for other manifestations of the disorder, such as high blood pressure if there is kidney disease.

## FOR MORE INFORMATION

- Lupus Foundation of America
  202/349-1155
  www.lupus.org
- National Institute of Arthritis and
  Musculoskeletal and Skin Diseases
  877/22-NIAMS
  www.niams.nih.gov
- American College of Rheumatology
  404/633-3777
  www.rheumatology.org

## INFORM YOURSELF

To find this and previous JAMA Patient Pages, go to the Patient Page link on *JAMA*'s Web site at www.jama.com. Many are available in English and Spanish.

*Source: National Institute of Arthritis and Musculoskeletal and Skin Diseases*

Sarah Ringold, MD, Writer

Cassio Lynm, MA, Illustrator

Richard M. Glass, MD, Editor

The JAMA Patient Page is a public service of *JAMA*. The information and recommendations appearing on this page are appropriate in most instances, but they are not a substitute for medical diagnosis. For specific information concerning your personal medical condition, *JAMA* suggests that you consult your physician. This page may be photocopied noncommercially by physicians and other health care professionals to share with patients. Any other print or online reproduction is subject to AMA approval. To purchase bulk reprints, call 718/946-7424.



Downloaded From: on 01/01/2018

**EXHIBIT 3**

## BRIEF REPORT

# Early Diagnosis and Treatment of Discoid Lupus Erythematosus

*Suresh Panjwani, MD, MSc, FRACGP*

**Discoid lupus erythematosus is a chronic dermatological disease that can lead to scarring, hair loss, and hyperpigmentation changes in skin if it is not treated early and promptly. It has a prolonged course and can have a considerable effect on quality of life. Early recognition and treatment improves the prognosis. The diagnosis is usually made by clinical examination. In some cases histopathology may be required to confirm the diagnosis. The histology is that of an inflammatory interface dermatosis. There is insufficient evidence for which treatment is most effective. Because lesions are induced or exacerbated by ultraviolet exposure, photoprotective measures are important. Potent topical steroids and antimalarials are the mainstay of treatment. Some cases of discoid lupus erythematosus can be refractory to standard therapy; in these cases retinoids, thalidomide, and topical tacrolimus offer alternatives, as do immunosuppressives like azathioprine, cyclosporine, mycophenolate mofetil, and methotrexate. (J Am Board Fam Med 2009;22:206–213.)**

Lupus erythematosus (LE) is thought to be an autoimmune disease among other connective tissue diseases like scleroderma, rheumatoid arthritis, polymyositis, and mixed connective tissue disease. Within the spectrum of diseases included in LE, at one end is a disease confined mainly to the skin and referred to as discoid lupus erythematosus (DLE) and at the other end is a florid disease with systemic involvement of heart, lungs, brain, kidneys and other organs called systemic lupus erythematosus (SLE). In between the 2 ends of the spectrum are disorders like subacute cutaneous lupus. Subacute cutaneous lupus erythematosus (SCLE) has a rather sudden onset with annular or psoriasiform plaques erupting on the upper trunk, arms, and/or dorsa of hands, usually after exposure to sunlight.[1] Although at the benign end of the spectrum, 1% to

5% of patients with discoid lupus may develop SLE[1] and 25% of patients with SLE may develop typical chronic discoid lesions at some time during the course of their illness.[2]

Lupus occurs in all age groups with a mean age varying from 21 years to 50 years[3] and a prevalence of 17 to 48 in 100,000,[4] with a greater prevalence in Afro-Caribbean people.[5] Although LE is an autoimmune disease, it is thought to result from an interplay of certain genetic factors, environmental factors like ultraviolet light, and hormonal factors with antibodies.

The diagnosis of discoid lupus is generally made based on clinical features. Histology may be required to confirm the diagnosis; it is that of a lichenoid tissue reaction with changes at the dermo-epidermal junction that include thickening of the basement membrane (best demonstrated by periodic acid-Schiff staining) and vacuolar degeneration of the basal cells along with perivascular and peri-appendageal inflammatory cell infiltration of a variable degree in the reticular dermis. Hyperkeratosis is more evident and follicular plugging may be seen in more mature lesions.

DLE tends to run a less severe course than SLE and has a better prognosis. It is important for family physicians to recognize DLE because it is a potentially scarring disease. Early referral and institution of treatment by dermatologists increases

This article was externally peer reviewed.
*Submitted* 13 April 2008; revised 23 June 2008; accepted 1 July 2008.
*From* Bounces Road Surgery, Forest Primary Care Centre, London, UK.
*Funding:* none.
*Prior presentation:* Much of this work was presented as the author's MSc Thesis in Clinical Dermatology; permission for use granted by St. John's Institute of Dermatology, King's College, London.
*Conflict of interest:* none declared.

*Corresponding author:* Suresh Panjwani, MD, MSc, FRACGP, 4 Harper Close, Southgate, London N14 4ES, United Kingdom (E-mail: sureshpanjwani18@hotmail.com).



**Figure 1. Plaques on beard and scalp in patient with discoid lupus erythematosus.**



**Figure 2.   Critical alopecia on scalp caused by discoid lupus erythematosus.**

the hope of minimizing the progression of the disease and consequent socioeconomic impact on the individual.

## Clinical Features

Discoid lupus is by far the most common manifestation of LE.[6] It commonly presents with erythematous, scaly papules and plaques (Figure 1) occurring on sun-exposed areas, although 50% of discoid lupus lesions are found on areas of hair-bearing scalp that are presumably protected from the sun[6] (Figures 2 and 3). In the localized variety of discoid lupus the lesions tend to be confined to the head and neck and in the generalized variety they occur both above and below the neck. Patients with generalized discoid have significantly greater chances of having laboratory abnormalities and of progressing to systemic LE. Most people with DLE do not have any systemic or serologic abnormality although antinuclear antibodies may be present.

Discoid lupus occurs at all ages and among all ethnic groups; it occurs more frequently in women than in men, but the predilection among women is not as marked as in systemic lupus. Discoid lupus starts as an erythematous papule or plaque, usually on the head or neck, with an adherent scale. The lesion tends to spread centrifugally and as it progresses there is follicular plugging and pigmentary changes, generally hyperpigmentation at the periphery, and hypopigmentation with atrophy, scarring, and telengiectasia at the center of the lesion (Figure 4).

Involvement of the scalp commonly produces a scarring alopecia,[6] but there has been an increase in incidence of alopecia areata among patients with LE.[7] Scarring alopecia was present in 34% of 89 patients with DLE and was associated with a prolonged disease course. More than half of those patients had scalp disease at the onset.[7] There are no reliable predictors of scalp involvement. Histologically there is a perifollicular lymphocytic inflammation maximal around mid-follicle. The mid-follicle is in fact a very important structure becuase it contains the bulge that contains the follicular stem cells.

## Treatment of Discoid Lupus Erythematosus

DLE is a scarring autoimmune disease that can linger on for a prolonged period, not surprisingly, the psychological impact is considerable.[4] Consequently there is a need for treatment, often prolonged, that incurs considerable expenditure for health facilities.



**Figure 3. Extensive loss of scalp hair in a patient with discoid lupus.**



**Figure 4.   Close-up view of plaque in a patient with discoid lupus.**

Early effective treatment may lead to total clearing of skin lesions, but failure of treatment results in permanent scarring; the depressed scars, hair loss, and pigmentary changes are often extremely disfiguring, particularly in darker-skinned people.[8] According to a 2004 systematic review of treatment of discoid lupus by Jessop et al[8] only 30 trials were identified through a search of the Cochrane Clinical Trials Register (December 1999); Medline (January 1966 to December 1999); Embase (January 1980 to January 2000); and Index Medicus (1956 to 1966).[8] Only 4 of these were controlled trials and only 2 of the latter were randomized (A, level 2). Accordingly, more evidence is needed to guide clinicians to the best treatment options for DLE, particularly for the severe type.

The treatment of DLE would in most instances be initiated at a dermatology department, but before instituting treatment for discoid lupus patients should be assessed for systemic involvement. This should include a full history and physical examination, full blood count, erythrocyte sedimentation rate, midstream urine, and antinuclear antibody.[9] If SLE is suspected, anti-double stranded DNA, extractable nuclear antigen, C3/C4, and renal review should also be included.[9]

### General Measures

Because cutaneous lesions of lupus are known to be induced or exacerbated by exposure to ultraviolet light, a logical approach in the management of discoid lupus must include sun avoidance and the liberal application of sunscreens. Patients should be educated about the use of sunscreens and protective clothing and behavior modification to avoid sun exposure, particularly between 10 AM and 4 PM. They should also be aware of water, snow, and sand surfaces, from which ultraviolet light may be reflected, and where harm can occur from reflected ultraviolet light.

They should be instructed to use sunscreens daily and apply liberally; they should reapply them if there has been prolonged sun exposure or when

they are wet.[10] Protection against both ultraviolet A and ultraviolet B is desirable because lupus is aggravated by both.[11,12] With disfigurement and alopecia, patients may benefit from advice on camouflage and the wearing of a wig.

### Topical Corticosteroids

Topical steroids are the mainstay of treatment of DLE. Patients usually start with a potent topical steroid applied twice a day, then switch to a lower-potency steroid as soon as possible. The minimal use of steroids reduces the recognized side effects like atrophy, telengiaectasiae, striae, and purpura.

### Intralesional Steroids

Intralesional steroids are particularly useful to treat chronic lesions, hyperkeratotic lesions, and those that do not respond adequately to topical steroids. Lesions at particular sites, eg, the scalp, may also benefit. Recognized side effects of intralesional steroids include cutaneous atrophy and dyspigmentation, which are not significant risks in experienced hands.[13] Oral steroids may be required for the control of systemic lupus but are not generally beneficial in DLE. For patients with progressive or disseminated disease or in those with localized disease that does not respond to topical measures, the addition of systemic agents should be considered.

### Antimalarials

Treatment with antimalarial drugs constitutes first-line systemic therapy for DLE. Therapy with antimalarials, either used singly or in combination, is usually effective.[14] The 3 commonly used preparations include chloroquine, hydroxychloroquin, and mepacrine. Mepacrine is not freely commercially available in the United States but is freely available in other countries like the United Kingdom.

It is customary to start hydroxychloroquine at a dose of 200 mg per day for an adult and, if there are no untoward gastrointestinal or other side effects, to increase the dose to twice a day. No more than 6.5 mg/kg/day should be administered. It is important to emphasize to the patient that it may take between 4 to 8 weeks for any clinical improvement. In some patients who do not respond to hydroxychloroquine, chloroquine may be more effective. Some patients do not respond well to monotherapy with either hydroxychloroquine or chloroquine, and in such cases the addition of mepacrine may be of benefit.[15]

In general, hydroxychloroquine and mepacrine are safe, well-tolerated drugs and adverse effects are relatively few, the most widely recognized being retinal toxicity.[16] Chloroquine causes macular pigmentation that progresses to a typical bull's eye lesion and then to widespread retinal pigment epithelial atrophy resembling retinitis pigmentosa.[16] This is dose related and can largely be avoided. The side effect spectrum between chloroquine and hydroxychloroquine is different, with ocular toxicity being mainly, although perhaps not exclusively, seen after chloroquine use. To prevent overdosing, doses should be calculated not on the actual weight of the patient but on ideal (lean) body weight;[17] this substantially reduces the risk of retinal toxicity.

Other adverse effects of antimalarials include gastrointestinal symptoms, eg, nausea and vomiting, and cutaneous side effects including pruritus, lichenoid drug reactions, annular erythema, hyperpigmentation, and hematological disturbances like leukopenia and thrombocytopenia.[18] Hemolysis is reported in individuals who are deficient in the enzyme glucose-6-phosphate-dehydrogenase. Hydroxychloroquine has, on rare occasions, caused toxic psychosis when used for the treatment of discoid lupus.[19] Prolonged mepacrine therapy may produce a yellow discoloration of the skin and urine. Hepatitis and aplastic anemia have also been reported.

Potentially more toxic therapeutic medication needs to be used in the management of many cases of DLE; however, topical tacrolimus ointment has been found recently to be useful in the management of DLE (see below). The different forms of therapeutic agents used in the management of DLE are highlighted in Table 1.

Thalidomide may provide one of the most useful therapeutic alternatives for chronic refractory DLE, although its distribution is limited to a few countries because of the risk of teratogenicity and polyneuropathy.[20] However, in a retrospective study of 18 patients with chronic DLE, Brocard et al[21] found low-dose thalidomide treatment was efficacious with good tolerance, with the most frequent side effect being usually mild asthenia.

### Other Drugs Used for the Treatment of DLE

#### Methotrexate

In 1995, Bottomley and Goodfield[22] found that methotrexate may be of help to patients with DLE resistant to conventional treatment; short-term

**Table 1. Different Drugs Used in the Treatment of Discoid Lupus Erythematosus**

| Name of Drug | Dose | Adverse Effects | Remarks |
|---|---|---|---|
| Topical and intralesional steroids | Start with potent topical preparation, strength of intradermal triamcinolone 3 to 5 mg/mL | Cutaneous atrophy, telangiectasiae, striae, and purpura with topical steroids; atrophy and dyspigmentation with intralesional steroids | Side effects from systemic absorption insignificant with topical steroids but can occur with intralesional steroids |
| Antimalarials | Start with 200 mg per day, no more than 6.5 mg/kg/day to be administered | Gastrointestinal upset, ocular toxicity, pruritus, drug eruptions, leucopenia, thrombocytopenia, haemolysis | Ocular toxicity more marked with chloroquine |
| Topical tacrolimus | 0.1% topical ointment | Burning, irritation of skin, pruritus | Contraindication- infections |
| Thalidomide | Initial dose of 100 to 200 mg/day, usual maintenance dose of 50 to 100 mg/day | Teratogenicity, polyneuropathy, drowsiness, nausea, skin eruptions, dryness of mouth and skin, oedema | Polyneuropathy uncommon with use of low doses |
| Azathioprine | Usual starting dose of 50 to 100 mg/day, usual maintenance dose of 25 to 50 mg/day | Myelosuppression, nausea, infections pancreatitis, rarely hepatotoxicity | Serum thiopurine methyltransferase should be measured |
| Cyclosporin | Initial dose of 4 to 5 mg/kg/day, which can be reduced with improvement | Hypertension, nephrotoxicity, hyperlipidemia, hypomagnesemia, gingival hyperplasia, headache, tremor, paresthesia, hypertrichosis, malignancy | Contraindications include uncontrolled hypertension, uncontrolled infections, and malignancy |
| Mycophenolate mofetil | Usual dose of 1 g twice a day | Gastric upset, headache, tremor, hypersensitivity, anemia, leucopenia and thrombocytopenia, infections, neoplasia | Full blood count should be checked regularly |
| Methotrexate | 5 to 15 mg once a week followed by initial test dose of 2.5 mg | Gastrointestinal upset, myelosuppression, liver toxicity, pulmonary fibrosis | Monitor full blood count, liver function tests, and renal function |
| Acitretin | 0.5 to 1 mg/kg/day | Teratogenicity, hyperlipidemia, dryness of skin, mucous membranes, taste disturbances, hair loss | Monitor full blood count, liver function tests, fasting lipids |

treatment is unlikely to be complicated by any significant side effects.[22] Full blood count and liver function along with renal function need to be checked before commencing treatment with methotrexate and regularly thereafter because it can cause myelosuppresion and hepatic and renal impairment.

### Cyclosporin A

This is a potent immunosuppressant because of its immunomodulating effect on helper T-cell function, inhibiting lymphocyte activation and proliferation. Because DLE is an inflammatory dermatosis with T-cell infiltrate it should not be surprising if cyclosporine is effective in the management of the condition. In 1994 Yell and Burge[23] tried cyclosporine in 2 patients with severe DLE and concluded that it was effective at a dose of 4 to 5 mg/kg/day, but others have not confirmed this finding. Blood pressure and kidney function need to be monitored, and hypertension is a common side effect. It can also cause gingival hyperplasia and hirsutism. Lipid disturbances can also occur and therefore serum cholesterol and triglycerides have to be monitored.

### Tacrolimus

Tacrolimus is a macrolide derived from the fungus *Streptomyces tsukubaensis* and has been used in recent years to treat a number of inflammatory and autoimmune conditions. When used as an ointment it acts as a local immunosuppressive agent. Walker et al[24] reported 2 patients with severe recalcitrant chronic discoid lupus that had not responded to potent topical steroids or antimalarials but dramatically responded to topical tacrolimus ointment in one case and a combination of clobetasol ointment and tacrolimus in the other.[24] Recently, Tzung et al[25] conducted a randomized double-blind study in which 20 patients were enrolled but only 11 women and 7 men (13 with malar rash of SLE, 4 with DLE, and 1 with SCLE) completed the study. All patients had facial cutaneous LE and were instructed to apply 0.1% tacrolimus ointment twice daily to the affected areas on one side of the face and 0.05% clobetasol propionate ointment on the other side; this was randomly assigned for each patient. The severity of lesions was assessed at each visit (weeks 0–4 and posttreatment week 4) using a 7-point rating scale. They found tacrolimus was as efficient as clobetasol in treating cutaneous LE (B, level 2).[25]

### Mycophenolate mofetil

This is an immunosuppressive agent that has been added relatively recently to the other drugs in this group and has been used increasingly in recent years for the treatment of various dermatoses that are inflammatory or autoimmune in origin. Mycophenolate is an ester prodrug of mycophenolic acid, initially isolated from *Penicillium* species.[26] Goyal and Nousari[27] described 2 cases of refractory discoid lupus involving the palms and soles that responded satisfactorily to mycophenolate mofetil.

### Azathioprine

Azathioprine, a potentially toxic drug, has been used in refractory cases of discoid lupus, with particular success among those with the involvement of the palms of the hands and the soles of the feet.[28] It is a synthetic derivative of 6-mercaptopurine and is an immunosuppressive drug. There are wide differences in the activity of the enzyme thiopurine methyltransferase in different individuals, which can be measured by a blood test. The chances of myelosuppression in a patient with very low levels of thiopurine methyltransferase are significantly greater than in others.

Other forms of treatment have recently been found to be useful in the treatment of DLE. Gul et al[29] described a case of generalized DLE successfully treated with 5% Imiquimod cream applied to lesions once a day 3 times a week. After 20 applications all of the lesions regressed significantly. Usmani and Goodfield[30] reported good to excellent responses in 12 out of 13 patients with DLE who were treated with efalizumab, a monoclonal antibody directed against CD 11a (discoid lupus is known to be predominantly t-cell mediated). Finally, Koch et al[31] suggest cryotherapy as a treatment option in cases of DLE lesions that are resistant to local or systemic recommended therapy. The standard therapies for the management of cutaneous lupus, including sunscreens, protective clothing, and behavioral alteration, and topical steroids with or without an antimalarial agent are often not used appropriately and can result in a situation in which the patient has a refractory disease.[32]

### Conclusion

DLE is a chronic scarring and potentially disfiguring disease seen in all parts of the world and among

all ethnic groups. It is an important cause of irreversible hair loss and is associated with considerable morbidity. It is extremely important for family physicians to diagnose this relatively uncommon condition early because early effective treatment is important to promote the resolution of established lesions and to prevent scarring. There are several forms of treatment that are effective to a lesser or greater degree than others. There are too few properly conducted randomized trials to enable an informed choice by clinicians. Clinicians at the present time are, therefore, likely to choose their preferred treatment based on their own experience. There is a need for further large randomized, controlled, and possibly multinational trials to be conducted that compare the effectiveness and safety of one form of treatment compared with another.

## References

1. Fitzpatrick TB, Johnson RA, Klaus W, Suurmond D. In colour atlas and synopsis of clinical dermatology, 4th ed. New York (NY): McGraw-Hill Companies; 2001:368–9.
2. Lahita RG. In systemic lupus erythematosus, 2nd ed. New York (NY): Churchill Livingstone; 1987:620.
3. Tebbe B, Orfanos CE. [Lupus erythematosus of the skin. An analysis of 97 patients.] Z Hautkr 1987;62: 1563–72, 1577–8, 1583–4.
4. Tebbe B, Orfanos CE. Epidemiology and socioeconomic impact of skin disease in lupus erythematosus. Lupus 1997;6:96–104.
5. Hochberg MC, Boyd RE, Ahearn JM, et al. Systemic lupus erythematosus: a review of clinico-laboratory features and immunogenetic markers in 150 patients with emphasis on demographic subsets. Medicine 1985;64:285–95.
6. Hymes SR, Jordon RE. Chronic cutaneous lupus erythematosus. Med Clin N Am 1989;73:1055–71.
7. Werth VP, White WL, Sanchez MR, Franks AG. Incidence of alopecia areata in lupus erythematosus. Arch Dermatol 1992;128:368–71.
8. Jessop S, Whitelaw D, Jordaan F. Drugs for discoid lupus erythematosus. Cochrane Database Syst Rev 2001;(1):CD002954.
9. Donnelly AM, Halbert AR, Rohr JB. Discoid lupus erythematosus. Australas J Dermatol 1995;36:3–10; quiz 11–2.
10. Ting WW, Sontheimer RD. Local therapy for cutaneous and systemic lupus erythematosus: practical and theoretical considerations. Lupus 2001;10:171–84.
11. Sanders CJ, Van Weelden H, Kazzaz GA, Sigurdsson V, Toonstra J, Bruijnzeel-Koomen CA. Photosensitivity in patients with lupus erythematosus: a clinical and photobiological study of 100 patients using a prolonged phototest protocol. Br J Dermatol 2003;149:131–7.
12. Lehmann P, Holzle E, Kind P, Goerz G, Plewig G. Experimental reproduction of skin lesions in lupus erythematosus by UVA and UVB radiation. J Am Acad Dermatol 1990;22:181–7.
13. Callen JP. Cutaneous lupus erythematosus: a personal approach to management. Australas J Dermatol 2006;47:13–27.
14. Callen JP. Treatment of cutaneous lesions in patients with lupus erythematosus. Dermatol Clin 1994;12:201–6.
15. von Schmiedeberg S, Rönnau AC, Schuppe HC, Specker C, Ruzicka T, Lehmann P. [Combination of antimalarial drugs mepacrine and chloroquine in therapy refractory cutaneous lupus erythematosus.] Hautarzt 2000;51:82–5.
16. Cruz DD. Antimalarial therapy: a panacea for mild lupus. Lupus 2001;10:148–51.
17. Mackenzie AH. Dose refinements in the long term therapy of rheumatoid arthritis with antimalarials. Am J Med 1983;75:40–5.
18. Lo JS, Berg RE, Tomecki K. Treatment of discoid lupus erythematosus. Int J Dermatol 1989;28:497–505.
19. Ward Q, Walter-Ryan WG, Shehi GM. Toxic psychosis: a complication of antimalarial therapy. J Am Acad Dermatol 1985;12:863–5.
20. Fabbri P, Cardinali C, Giomi B, Caproni M. Cutaneous lupus erythematosus: diagnosis and management. Am J Clin Dermatol 2003;4:449–65.
21. Brocard A, Barbarot S, Milpied B, Stalder JF. Thalidomide in the treatment of chronic discoid lupus erythematosus. Ann Dermatol Venereol 2005;132 (11 Pt 1):853–6.
22. Bottomley WW, Goodfield MJ. Methotrexate for the treatment of discoid lupus erythematosus. Br J Dermatol 1995;133:655–6.
23. Yell JA, Burge SM. Cyclosporin and discoid lupus erythematosus. Br J Dermatol 1994;131:132–48.
24. Walker SL, Kirby B, Chalmers RJ. The effect of topical tacrolimus on severe recalcitrant chronic discoid lupus erythematosus. Br J Dermatol 2002;147: 405–6.
25. Tzung TY, Liu YS, Chang HW. Tacrolimus vs. clobetasol propionate in the treatment of facial cutaneous lupus erythematosus: a randomized, double-blind, bilateral comparison study. Br J Dermatol 2007;156:191–2.
26. Nousari HC, Sragovich A, Kimyai-Asadi A, Orlinsky D, Anhalt GJ. Mycophenolate mofetil in autoimmune and inflammatory skin disorders. J Am Acad Dermatol 1999;40(2 Pt 1):265–7.
27. Goyal S, Nousari HC. Treatment of resistant discoid lupus erythematosus of palms and soles with mycophenolate mofetil. J Am Acad Dermatol 2001;45: 142–4.

28. Abu Shakra M, Shoenfield Y. Azathioprine therapy for patients with systemic lupus erythematosus. Lupus 2001;10:152–3.

29. Gül U, Gönül M, Cakmak SK, Kiliç A, Demiriz M. A case of generalized discoid lupus erythematosus: successful treatment with imiquimod cream 5%. Adv Ther 2006;23:787–92

30. Usmani N, Goodfield M. Efalizumab in the treatment of discoid lupus erythematosus. Arch Dermatol 2007;143:873–7.

31. Koch M, Horwath-Winter J, Aberer E, Salmhofer W, Klein A. [Cryotherapy in discoid lupus erythematosus (DLE).] Ophthalmologe 2008;105:381–3.

32. Callen JP. Management of refractory skin disease in patients with lupus erythematosus. Best Pract Res Clin Rheumatol 2005;19:767–84.

**EXHIBIT 4**



# Lupus

## Overview

Lupus is a systemic autoimmune disease that occurs when your body's immune system attacks your own tissues and organs. Inflammation caused by lupus can affect many different body systems — including your joints, skin, kidneys, blood cells, brain, heart and lungs.

Lupus can be difficult to diagnose because its signs and symptoms often mimic those of other ailments. The most distinctive sign of lupus — a facial rash that resembles the wings of a butterfly unfolding across both cheeks — occurs in many but not all cases of lupus.

Some people are born with a tendency toward developing lupus, which may be triggered by infections, certain drugs or even sunlight. While there's no cure for lupus, treatments can help control symptoms.

## Symptoms

No two cases of lupus are exactly alike. Signs and symptoms may come on suddenly or develop slowly, may be mild or severe, and may be temporary or permanent. Most people with lupus have mild disease characterized by episodes — called flares — when signs and symptoms get worse for a while, then improve or even disappear completely for a time.

The signs and symptoms of lupus that you experience will depend on which body systems are affected by the disease. The most common signs and symptoms include:

- Fatigue
- Fever
- Joint pain, stiffness and swelling
- Butterfly-shaped rash on the face that covers the cheeks and bridge of the nose or rashes elsewhere on the body
- Skin lesions that appear or worsen with sun exposure (photosensitivity)
- Fingers and toes that turn white or blue when exposed to cold or during stressful periods (Raynaud's phenomenon)
- Shortness of breath
- Chest pain
- Dry eyes
- Headaches, confusion and memory loss

### When to see a doctor

See your doctor if you develop an unexplained rash, ongoing fever, persistent aching or fatigue.

## Causes

Lupus occurs when your immune system attacks healthy tissue in your body (autoimmune disease). It's likely that lupus results from a combination of your genetics and your environment.

It appears that people with an inherited predisposition for lupus may develop the disease when they come into contact with something in the environment that can trigger lupus. The cause of lupus in most cases, however, is unknown. Some potential triggers include:

- **Sunlight.** Exposure to the sun may bring on lupus skin lesions or trigger an internal response in susceptible people.
- **Infections.** Having an infection can initiate lupus or cause a relapse in some people.
- **Medications.** Lupus can be triggered by certain types of blood pressure medications, anti-seizure medications and antibiotics. People who have drug-induced lupus usually get better when they stop taking the medication. Rarely, symptoms may persist even after the drug is stopped.

## Risk factors

Factors that may increase your risk of lupus include:

- **Your sex.** Lupus is more common in women.

- **Age.** Although lupus affects people of all ages, it's most often diagnosed between the ages of 15 and 45.
- **Race.** Lupus is more common in African-Americans, Hispanics and Asian-Americans.

# Complications

Inflammation caused by lupus can affect many areas of your body, including your:

- **Kidneys.** Lupus can cause serious kidney damage, and kidney failure is one of the leading causes of death among people with lupus.
- **Brain and central nervous system.** If your brain is affected by lupus, you may experience headaches, dizziness, behavior changes, vision problems, and even strokes or seizures. Many people with lupus experience memory problems and may have difficulty expressing their thoughts.
- **Blood and blood vessels.** Lupus may lead to blood problems, including anemia and increased risk of bleeding or blood clotting. It can also cause inflammation of the blood vessels (vasculitis).
- **Lungs.** Having lupus increases your chances of developing an inflammation of the chest cavity lining (pleurisy), which can make breathing painful. Bleeding into lungs and pneumonia also are possible.
- **Heart.** Lupus can cause inflammation of your heart muscle, your arteries or heart membrane (pericarditis). The risk of cardiovascular disease and heart attacks increases greatly as well.

## Other types of complications

Having lupus also increases your risk of:

- **Infection.** People with lupus are more vulnerable to infection because both the disease and its treatments can weaken the immune system.
- **Cancer.** Having lupus appears to increase your risk of cancer; however the risk is small.
- **Bone tissue death (avascular necrosis).** This occurs when the blood supply to a bone diminishes, often leading to tiny breaks in the bone and eventually to the bone's collapse.
- **Pregnancy complications.** Women with lupus have an increased risk of miscarriage. Lupus increases the risk of high blood pressure during pregnancy (preeclampsia) and preterm birth. To reduce the risk of these complications, doctors often recommend delaying pregnancy until your disease has been under control for at least six months.

By Mayo Clinic Staff

Any use of this site constitutes your agreement to the Terms and Conditions and Privacy Policy linked below.

Terms and Conditions
Privacy Policy
Notice of Privacy Practices
Notice of Nondiscrimination
Manage Cookies

Mayo Clinic is a nonprofit organization and proceeds from Web advertising help support our mission. Mayo Clinic does not endorse any of the third party products and services advertised.

Advertising and sponsorship policy
Advertising and sponsorship opportunities

A single copy of these materials may be reprinted for noncommercial personal use only. "Mayo," "Mayo Clinic," "MayoClinic.org," "Mayo Clinic Healthy Living," and the triple-shield Mayo Clinic logo are trademarks of Mayo Foundation for Medical Education and Research.

© 1998-2019 Mayo Foundation for Medical Education and Research (MFMER). All rights reserved.

**EXHIBIT 5**

Research

### Brief Report

# Association of Systemic Lupus Erythematosus With Uveitis

Kevin Gallagher, BMBCh, FRCOphth; Ananth Viswanathan, FRCOphth; Narciss Okhravi, FRCOphth, PhD

**IMPORTANCE** Systemic lupus erythematosus (SLE) can be associated with uveitis. The reported prevalence of SLE in patients with uveitis varies from 0.1% to 4.8%. Accordingly, the positive predictive value of antinuclear antibody testing in diagnosing SLE in a patient with uveitis varies enormously. An accurate estimate of SLE prevalence in uveitis is needed to establish the value of routine antinuclear antibody testing in patients with uveitis.

**OBSERVATIONS** A literature review using the Medline database was performed to find studies reporting data on uveitis etiology from January 1, 1984, to March 20, 2015. Studies were included where there were sufficient data to draw conclusions on the prevalence of SLE as an etiological factor in uveitis. Data for 53 315 patients were reviewed and 63 studies from 30 countries were included. The prevalence of SLE as a cause of uveitis was estimated to be 0.47% (95% CI, 0.41%-0.53%). The positive predictive value of routine antinuclear antibody testing was 2.9% (95% CI, 2.65%-3.19%).

**CONCLUSIONS AND RELEVANCE** Systemic lupus erythematosus is a rare cause of uveitis. Routine antinuclear antibody testing has a low positive predictive value for SLE. These data suggest such testing should be reserved for patients where there is a higher pretest probability of SLE.

*JAMA Ophthalmol*. 2015;133(10):1190-1193. doi:10.1001/jamaophthalmol.2015.2249
Published online July 16, 2015.

+ Supplemental content at
jamaophthalmology.com

**Author Affiliations:** Moorfields Eye Hospital National Health Society Foundation Trust, London, England (Gallagher, Viswanathan, Okhravi); Department of Undergraduate Education, Moorfields Eye Hospital National Health Society Foundation Trust, London, England (Gallagher, Okhravi); National Institute for Health Research Biomedical Research Centre, Moorfields Eye Hospital National Health Society Foundation Trust, London, England (Viswanathan, Okhravi); University College London Institute of Ophthalmology, London, England (Viswanathan, Okhravi).

**Corresponding Author:** Kevin Gallagher, BMBCh, FRCOphth, Department of Undergraduate Education, Moorfields Eye Hospital, City Road, London EC1V 2PD, England (kevin.gallagher@moorfields.nhs.uk).

Systemic lupus erythematosus is a systemic autoimmune condition that can be associated with uveitis. The prevalence of SLE as a cause of uveitis varies in the literature. In 1990, Rosenbaum and Wernick[1] reported on the use of routine antinuclear antibody (ANA) testing for patients with uveitis. Their Bayesian analysis required a pretest probability of SLE in patients with uveitis. Rosenbaum and Wernick[1] estimated a prevalence of SLE as a cause of uveitis as 0.1%. This estimate was based on 1218 patients in 3 studies in the 1980s where SLE was neither found nor explicitly mentioned. Based on this prevalence, they estimated that with a positive ANA test result in a patient with uveitis, the chance of the patient having SLE was less than 1%. They recommended against the routine screening of patients with uveitis with ANA testing in the absence of other features suggestive of SLE. A higher pretest probability resulted in a higher posttest probability.

Rodriguez et al[2] described the etiology of uveitis in 1237 patients attending the Massachusetts Eye and Ear Infirmary, reporting the prevalence of SLE as 4.8%. Substituting this value for pretest probability into the Bayesian analysis performed by Rosenbaum and Wernick[1] resulted in a 24% posttest probability of having SLE. Thus, the prevalence of SLE in uveitis determines the value of routine ANA testing.

The aim of this brief report was to provide an estimate of the prevalence of SLE as a cause of uveitis in patients attending specialist clinics based on worldwide reports of uveitis etiologies.

## Methods

An extensive literature search using the Medline database was conducted from January 1, 1984, to March 20, 2015. Search terms included *uveitis*, *etiology*, *patterns*, *epidemiology*, and *classification*. Articles in English and pertaining to humans were included. The inclusion of studies was limited to those reporting on uveitis in adults and those that included sufficient data on etiology from which conclusions about SLE prevalence could be drawn.

In studies where all cases were assigned a diagnosis, the number of cases with SLE was recorded. In a number of studies, disease entities with low frequencies were grouped as other or miscellaneous. In these circumstances, certain assumptions were made to estimate SLE frequency. Such assumptions were designed to give the highest possible estimate of SLE frequency. For example, if a miscellaneous group with 16 patients and any 1 of a possible 6 diagnoses

Copyright 2015 American Medical Association. All rights reserved.

Downloaded From:  by a Sidley Austin LLP User  on 10/20/2018

Association of Systemic Lupus Erythematosus With Uveitis

Brief Report   Research

were found recorded in a table of etiologies and in the same table, a diagnosis that appeared in 4 or more cases was mentioned specifically, then the assumption was made that no more than 3 of the cases in the miscellaneous group could be secondary to SLE. By using this method, a value for the likely maximum of SLE prevalence in uveitis was determined. We also calculated the prevalence by only counting cases where a diagnosis of SLE was specifically mentioned.

### At a Glance

- Sixty-three studies reporting on the etiology of uveitis in 53 315 patients were reviewed to estimate the prevalence of systemic lupus erythematosus as a cause of uveitis.
- The estimated prevalence of systemic lupus erythematosus in uveitis was 0.47% (95% CI, 0.41%-0.53%).
- The positive predictive value of routine antinuclear antibody testing in uveitis was 2.9% (95% CI, 2.65%-3.19%).
- These data suggest routine antinuclear antibody testing in uveitis should not be recommended but reserved for cases where the pretest probability of systemic lupus erythematosus is higher.

## Results

In total, 63 studies were included that reported on the etiology of uveitis in 53 315 patients (eReferences in the Supplement). There was a range of 42 to 8759 patients (median, 548 patients; mean, 833 patients). Five studies reported exclusively on anterior uveitis, 2 reported on intermediate uveitis only, and 1 reported only on posterior and panuveitis combined. One study did not report on cases of intermediate uveitis. All other studies included cases with anterior uveitis, intermediate uveitis, posterior uveitis, and panuveitis.

The mean SLE prevalence for all studies combined was 0.47% (95% CI, 0.41%-0.53%). If cases were only counted where SLE was specifically mentioned, the prevalence estimate was 0.31% (eTable in the Supplement).

The anatomical classification of uveitis associated with SLE was presented in only 18 studies. In these 18 studies, there were 72 cases of anterior uveitis, 3 cases of intermediate uveitis, 26 cases of posterior uveitis, and 4 cases of panuveitis.

## Discussion

The overall prevalence of SLE in patients with uveitis seen in specialist clinics was 0.47%. If we used this value as the pretest probability in the Rosenbaum and Wernick analysis[1] (specificity, 85%; sensitivity, 95%), we could derive values for the positive and negative predictive values of positive and negative ANA test results (**Figure 1**). The posttest probability of a patient with a positive ANA test result (ie, positive predictive value) was 2.9% (95% CI, 2.65%-3.19%). Therefore, for every true-positive test result, there were 34 false-positive test results (**Figure 2**).



Figure 1. Bayesian Analysis of Routine Antinuclear Antibody Testing in Patients With Uveitis



Copyright 2015 American Medical Association. All rights reserved.

Downloaded From:  by a Sidley Austin LLP User  on 10/20/2018

Research   Brief Report                                                          Association of Systemic Lupus Erythematosus With Uveitis

Figure 2. Icon Array Showing Results of Antinuclear Antibody Testing in 1000 Patients With Uveitis



Legend:
- ■ True positive (n = 4.47)
- ■ False negative (n = 0.23)
- ■ False positive (n = 149.3)
- ■ True negative (n = 846)

Prevalence was 0.47%, sensitivity was 95%, and specificity was 85%. There were 34 false-positive test results for every true-positive test result.

The specificity and sensitivity of ANA testing in diagnosing SLE varies in the literature. One series found the sensitivity to be only 70%.[3] Other studies calculated the specificity and sensitivity of ANA testing in diagnosing SLE as 92% and 98%, respectively.[4] Substituting these values into the calculations in the eTable in the Supplement gave a positive predictive value of 5.47% and negative predictive value of 99.99% (calculations not shown). Even with this improved sensitivity and specificity, for every true-positive ANA test result, there were 19 false-positive test results. False-positive test results may lead to anxiety for patients as well as costs in time and money in the referral for a rheumatology assessment.[5]

Our estimated SLE prevalence in uveitis of 0.47% is a likely overestimate given the assumptions described earlier. If we use the lower estimated prevalence of 0.31%, the positive predictive value of a positive ANA test result is less than 2%.

## Conclusions

Our theoretical calculations for the positive predictive value of a positive ANA test result in uveitis were very close to those found in another study investigating patients who were referred to a tertiary rheumatology clinic for evaluation of a positive ANA test result. The authors confirmed the poor positive predictive value of a positive ANA test result for SLE was 2.1%. This low positive predictive value was largely due to unnecessary testing in patients with low pretest probabilities of the disease.[6] Our study reinforces this view and suggests that routine testing of ANA in patients with uveitis is not justified (an exception would be in patients with juvenile idiopathic arthritis and uveitis where a positive ANA test result may influence management and follow-up). A positive test result is much more likely to rep-

Copyright 2015 American Medical Association. All rights reserved.

Downloaded From:  by a Sidley Austin LLP User  on 10/20/2018

Association of Systemic Lupus Erythematosus With Uveitis

Brief Report Research

resent a false-positive test result than a true-positive test result. Patients with systemic features suggestive of SLE or in cases where the ocular phenotype is in keeping with SLE (eg, scleritis or retinal arteritis) will have a higher pretest probability. Our analysis suggests that ANA testing in these cases would be warranted.

## ARTICLE INFORMATION

**Submitted for Publication:** March 30, 2015; final revision received May 28, 2015; accepted May 29, 2015.

**Published Online:** July 16, 2015.
doi:10.1001/jamaophthalmol.2015.2249.

**Author Contributions:** Dr Gallagher had full access to all of the data in the study and takes responsibility for the integrity of the data and the accuracy of the data analysis.
*Study concept and design:* All authors.
*Acquisition, analysis, or interpretation of data:* All authors.
*Drafting of the manuscript:* All authors.
*Critical revision of the manuscript for important intellectual content:* Viswanathan, Okhravi.
*Statistical analysis:* All authors.
*Administrative, technical, or material support:* Okhravi.
*Study supervision:* Viswanathan, Okhravi.

**Conflict of Interest Disclosures:** All authors have completed and submitted the ICMJE Form for Disclosure of Potential Conflicts of Interest and none were reported.

## REFERENCES

**1**. Rosenbaum JT, Wernick R. The utility of routine screening of patients with uveitis for systemic lupus erythematosus or tuberculosis: a Bayesian analysis. *Arch Ophthalmol*. 1990;108(9):1291-1293.

**2**. Rodriguez A, Calonge M, Pedroza-Seres M, et al. Referral patterns of uveitis in a tertiary eye care center. *Arch Ophthalmol*. 1996;114(5):593-599.

**3**. Tan EM, Feltkamp TEW, Smolen JS, et al. Range of antinuclear antibodies in "healthy" individuals. *Arthritis Rheum*. 1997;40(9):1601-1611.

**4**. Wichainun R, Kasitanon N, Wangkaew S, Hongsongkiat S, Sukitawut W, Louthrenoo W. Sensitivity and specificity of ANA and anti-dsDNA in the diagnosis of systemic lupus erythematosus: a comparison using control sera obtained from healthy individuals and patients with multiple medical problems. *Asian Pac J Allergy Immunol*. 2013;31(4):292-298.

**5**. Jackson BR. The dangers of false-positive and false-negative test results: false-positive results as a function of pretest probability. *Clin Lab Med*. 2008;28(2):305-319, vii.

**6**. Abeles AM, Abeles M. The clinical utility of a positive antinuclear antibody test result. *Am J Med*. 2013;126(4):342-348.

**Copyright 2015 American Medical Association. All rights reserved.**

Downloaded From:  by a Sidley Austin LLP User  on 10/20/2018

**EXHIBIT 6**

**CONCISE REPORT**

# Acute abdominal pain in systemic lupus erythematosus: focus on lupus enteritis (gastrointestinal vasculitis)

## C-K Lee, M S Ahn, E Y Lee, J H Shin, Y-S Cho, H K Ha, B Yoo, H-B Moon

Ann Rheum Dis 2002;**61**:547–550

**Objective:** To determine the causes of acute abdominal pain in systemic lupus erythematosus (SLE) and to compare the clinical and laboratory data, especially antiphospholipid antibodies and the SLE Disease Activity Index (SLEDAI), between lupus enteritis (gastrointestinal vasculitis) and acute abdominal pain without lupus enteritis in patients with SLE.

**Methods:** A retrospective study was carried out for all patients admitted with SLE from 1993 to March 2001. The SLEDAI and laboratory data were collected at the time of diagnosis of SLE and at the time of acute abdominal pain. Lupus enteritis (gastrointestinal vasculitis) was diagnosed by clinical investigation and abdominal computed tomographic findings.

**Results:** Chart review identified 175 patients (20 male, 155 female) who had been admitted with SLE. Of these patients, 38 (22%) presented with acute abdominal pain. Lupus enteritis was the most common cause of acute abdominal pain. Patients were divided into three groups: group 1: lupus enteritis (n=17), group 2: acute abdominal pain without lupus enteritis (n=21), and group 3: SLE without acute abdominal pain (n=137). There was no difference in age and sex among the three groups. Antiphospholipid, anti-RNP, anti-Sm, anti-Ro, and anti-La antibodies did not differ among the three groups. There was no difference in the SLEDAI at the time of diagnosis and at the time of acute abdominal pain between groups 1 and 2. Complement, erythrocyte sedimentation rate, C reactive protein, and anti-dsDNA measured at the time of acute abdominal pain did not differ between groups 1 and 2. A drop in the white blood cell count at the time of abdominal pain was more prominent in group 1 than group 2. In lupus enteritis, the jejunum and ileum were the sites most commonly affected. Rectal involvement was rare. Even though four patients relapsed, all the patients with lupus enteritis, including those who relapsed, responded well to corticosteroid.

**Conclusion:** Lupus enteritis is the most common cause of acute abdominal pain in SLE. All patients with lupus enteritis responded well to a high dose of a corticosteroid without surgical intervention. The SLEDAI and laboratory data, except leucopenia, do not correlate with the occurrence of lupus enteritis.

S ystemic lupus erythematosus (SLE) is a multifactorial autoimmune disease that mostly affects young women, resulting in significant morbidity and mortality. Lupus enteritis, with or without infarction, is one of the most serious complications of SLE. Lupus enteritis may contribute to greater morbidity and mortality, and early recognition and treatment are important if long term survival is to be improved. The occurrence of acute abdominal pain in SLE is a challenging diagnostic and therapeutic problem. Evaluation of abdominal pain in patients with SLE is complicated by the disease itself and by concomitant disease. The side effects of drugs are also often a problem in evaluation.

The presence of the antiphospholipid antibody (aPL) is more likely to be associated with thrombosis or chronic fetal miscarriages.[1] To the best of our knowledge, the relation between reversible ischaemic bowel disease in SLE and aPL has not been adequately investigated.

In the hope of detecting variables for predicting the occurrence of lupus enteritis, we performed a retrospective case-control study to examine clinical and laboratory variables, particularly aPL and the systemic lupus Disease Activity Index (SLEDAI).[2]

## PATIENTS AND METHODS

### Patients

We reviewed the records of patients with SLE who had been admitted to our hospital from 1993 to March 2001 and we identified patients who had presented with acute abdominal pain. All the patients fulfilled the 1982 revised American Rheumatism Association criteria for the classification of SLE.[3] During this eight year period, 175 patients (20 male, 155 female) were studied. Of these patients, 38 (22%) presented with acute abdominal pain. Patients were divided into three groups. Lupus enteritis (n=17) (group 1) was diagnosed if at least three of the following signs were seen on a computed tomographic (CT) scan: bowel wall thickening, target sign, dilatation of intestinal segments, engorgement of mesenteric vessels, and increased attenuation of mesenteric fat.[4] Two control groups were selected. The first control group (n=21) (group 2) comprised patients with acute abdominal pain without lupus enteritis. The second control group (n=137) (group 3) consisted of patients with SLE without acute abdominal pain.

### Clinical features and laboratory data

The demographic data of the patients (sex, age, duration of disease, and duration of abdominal pain) were recorded. SLEDAI was calculated at the time of diagnosis of SLE and at the time of acute abdominal pain. The laboratory data, including the white blood cell (WBC) count, haemoglobin, platelets, complement, erythrocyte sedimentation rate (ESR), C reactive protein (CRP), anti-dsDNA, aPL, anti-Sm antibody, anti-ribonucleoprotein (anti-RNP) antibody, anti-Ro antibody, and anti-La antibody, were measured at the time of diagnosis of SLE. The WBC count, haemoglobin, platelets, complement, ESR, CRP, and anti-dsDNA were measured at the time of acute

**Abbreviations:** aPL, antiphospholipid antibody; β₂GPI, β₂-glycoprotein I; CRP, C reactive protein; CT, computed tomographic (scan); ELISA, enzyme linked immunosorbent assay; ESR, erythrocyte sedimentation rate; GI, gastrointestinal; SLE, systemic lupus erythematosus; SLEDAI, SLE Disease Activity Index; WBC, white blood cell

| Table 1 | Autoantibody profile | | | |
|---|---|---|---|---|
| | Group 1 (n=17) | Group 2 (n=21) | Group 3 (n=137) | p Value |
| aPL | 7/16 | 10/18 | 45/83 | 0.72 |
| LAC | 1/15 | 4/17 | 20/76 | 0.26 |
| aCL (IgG/IgM) | 6/15 | 9/17 | 32/65 | 0.75 |
| $\beta_2$GPI (IgG/IgM) | 2/13 | 2/11 | 4/28 | 0.41 |
| Anti-RNP | 4/14 | 4/19 | 29/94 | 0.69 |
| Anti-Sm | 2/15 | 4/19 | 15/95 | 0.81 |
| Anti-Ro | 7/14 | 5/17 | 43/93 | 0.39 |
| Anti-La | 1/14 | 1/17 | 12/92 | 0.60 |

Group 1, lupus enteritis; group 2, acute abdominal pain without lupus enteritis; group 3, SLE without acute abdominal pain; aPL, antiphospholipid antibody; LAC, lupus anticoagulant; aCL, anticardiolipin antibody; $\beta_2$GPI, $\beta_2$-glycoprotein I.

abdominal pain and were compared with levels calculated at the time of diagnosis of SLE. CRP was measured quantitatively by immunonephelometry (N Latex CRP mono, Behring Diagnostics, San Jose, California, USA) (normal 0–6 mg/l). Complements 3 and 4 were calculated by nephelometry (Beckman Array System, Beckman Instruments, Brea, California, USA) (normal 880–2010 mg/l and 160–407 mg/l, respectively). Anti-dsDNA antibody was detected by radioimmunometric assay (anti-dsDNA kit, Ortho-Clinical Diagnostics, Rochester, NY, USA) (normal 0–7 IU/ml). A lupus anticoagulant test was performed using dilute Russell viper venom time reagent (STAgo compact, Diagnostica STAGO, France). Anticardiolipin antibody (IgG/IgM) was detected by the enzyme linked immunosorbent assay (ELISA) (Varelisa cardiolipin antibody kit, Pharmacia and Upjohn Diagnostics, Freiburg, Germany). Anti-$\beta_2$-glycoprotein I (anti-$\beta_2$GPI) antibody (IgG/IgM) was detected by ELISA (anti- $\beta_2$GPI-QUANTA Lite Kit, INOVA Diagnostics, San Diego, USA).

Four patients with lupus enteritis (n=17) relapsed. For the 21 patients of lupus enteritis, CT scanning recorded the sites affected and the characteristic findings.

### Statistical methods

Laboratory indices and the SLEDAI were tested by the Mann-Whitney test, Kruskal-Wallis test, and the $\chi^2$ test. A p value of <0.05 was considered significant.

### RESULTS

There were no differences in sex (male/female: 2/15, 3/18, 15/122, p=0.90) and age (mean (SD): 34 (12.5), 36 (11.6), 38 (12.2), p=0.29) among the three groups. The average duration (months) between SLE diagnosis and acute abdominal pain was no different between groups 1 and 2 (36 (44.0), 28.8 (33.4), p=0.26). The duration (days) of acute abdominal pain symptoms before admission to hospital was no different between groups 1 and 2 (6.3 (7.4), 8.9 (8.9), p=0.26). Lupus enteritis was the initial manifestation of SLE in 6/17 cases. Lupus enteritis was the most common cause of acute abdominal pain in our data, occurring in 17/38 (45%) patients. Urinary tract infection occurred in 6 (16%), acute gastroenteritis in 5 (13%), pancreatitis in 2 (5%), infectious diarrhoea in 2 (5%), haemorrhagic gastritis in 2 (5%), serositis in 1 (3%), cholecystitis in 1 (3%), IVC thrombosis in 1 (3%), and gastric ulcer in 1 (3%). The frequencies of autoantibodies were compared among the three groups (table 1). The presence of aPL was determined if one of the following three tests was positive on two occasions, at least six weeks apart: lupus anticoagulant test, anticardiolipin antibody, and anti-$\beta_2$GPI antibody.[5] There was no difference in the positivity of aPL among the three groups. The frequencies of anti-RNP, anti-Sm, anti-Ro, and anti-La were no different among the three groups.

Table 2 describes the laboratory indices and the SLEDAI calculated at the time of diagnosis of SLE and at the time of acute abdominal pain. Differences of laboratory indices and the

SLEDAI between two episodes were also measured. A drop in the WBC count at the time of abdominal pain was much more prominent in group 1. Other laboratory indices (haemoglobin, ESR, anti-dsDNA, CRP, C3, and C4) were no different between groups 1 and 2. Thus, only the fall in the WBC count, correlated with the occurrence of lupus enteritis. The SLEDAI calculated at the time of diagnosis of SLE (mean 13.7 (range 6–28) $v$ 17.0 (range 2–42)) and at the time of acute abdominal pain (mean 10.3 (range 2–28) $v$ 12.5 (range 2–26)) did not differ between groups 1 and 2. At the time of diagnosis, the clinical involvement defined in the SLEDAI did not differ among the three groups: the kidney (12/17, 15/21, 85/137, p=0.59), central nervous system (0/17, 4/21, 19/137, p=0.19), skin/mucosa (10/17, 16/21, 92/137, p=0.52), blood (4/17, 12/21, 53/137, p=0.10), and musculoskeletal system involvement (3/17, 10/21, 57/137, p=0.12). Also, the clinical involvement did not differ between groups 1 and 2 at the time of acute abdominal pain. As for most of the laboratory indices, the SLEDAI did not correlate with the occurrence of lupus enteritis.

Of 21 episodes of lupus enteritis, including relapsed cases (n=4), all had bowel wall thickening. Target sign (fig 1) was seen in 14 cases (67%). The jejunum and the ileum were the sites most commonly affected, being involved in 17 (80%) and 18 (85%) cases, respectively. Rectal involvement was rare, occurring in only three (14%) cases. Nineteen of 21 cases had bowel involvement in multiple vascular territories not confined in one vascular territory. Of 21 cases, none had mesenteric vascular thrombosis on abdominal CT scans.

Patients were treated with intravenous high dose methylprednisolone (1 mg/kg/day) and all responded well. Subsequently, intravenous methylprednisolone was switched to oral prednisolone (median 5 days, range 1–34 days) and tapered. Four patients relapsed when the steroid treatment was tapered. However, the patients who relapsed responded well to intravenous methylprednisolone without the addition of other immunosuppressive agents. Surgical intervention was not needed during the follow up of lupus enteritis (median 29 months, range 2–87 months).

### DISCUSSION

Gastrointestinal vasculitis, with or without infarction, is one of the most serious complications of SLE. The prevalence of intestinal vasculitis in patients with SLE has been reported to range from 0.2 to 53%.[6 7] Although the underlying lesion in most cases of gastrointestinal (GI) vasculitis in SLE is a small vessel arteritis or venulitis, vasculitis is not found in all cases. Therefore, we applied the term "lupus enteritis" rather than GI vasculitis to GI tract lesions in our patients with SLE. Medina et al looked at the aetiology of abdominal pain in 51 patients with active and inactive SLE using the SLEDAI.[6] Patients with gastrointestinal vasculitis (19 cases) or thrombosis (three cases) had higher SLEDAI scores than 14 active patients with SLE with non-SLE related acute abdomen. In

Case 1:19-cv-00331-RC   Document 1   Filed 02/08/19   Page 60 of 80
Acute abdominal pain in SLE
549

**Table 2**  Laboratory data and SLEDAI. Results shown as mean (SD)

| | Group 1 (n=17) | Group 2 (n=21) | Group 3 (n=137) | p Value |
|---|---|---|---|---|
| WBC (×10⁹/l) | | | | |
| Dx | 7.56 (3.79) | 4.80 (4.19) | 5.44 (3.69) | 0.00* |
| AA | 6.79 (3.95) | 6.84 (4.54) | | 0.70 |
| Δ(AA-Dx) | −0.78 (3.58) | 2.04 (3.88) | | 0.01* |
| Hb (g/l) | | | | |
| Dx | 109 (21) | 104 (25) | 99 (27) | 0.39 |
| AA | 115 (17) | 109 (19) | | 0.22 |
| Δ(AA-Dx) | 6 (16) | 4 (14) | | 0.98 |
| PLT (×10⁹/l) | | | | |
| Dx | 270.9 (112.0) | 139.7 (92.8) | 181.4 (101.3) | 0.00* |
| AA | 273.4 (97.6) | 151.7 (91.6) | | 0.00* |
| Δ(AA-Dx) | 2.4 (78.4) | 11.9 (61.1) | | 0.91 |
| C3 (mg/l) | | | | |
| Dx | 528 (183) | 415 (201) | 528 (183) | 0.21 |
| AA | 562 (201) | 551 (352) | | 0.38 |
| Δ(AA-Dx) | 51 (209) | 137 (299) | | 0.35 |
| C4 (mg/l) | | | | |
| Dx | 153 (73) | 139 (89) | 155 (104) | 0.62 |
| AA | 135 (65) | 174 (109) | | 0.63 |
| Δ(AA-Dx) | −7.7 (63) | 35 (75) | | 0.25 |
| ESR (mm/1st h) | | | | |
| Dx | 45.6 (32.1) | 59.3 (43.7) | 59.8 (37.6) | 0.39 |
| AA | 47.6 (23.7) | 59.0 (45.2) | | 0.65 |
| Δ(AA-Dx) | 1.6 (24.5) | −0.28 (20.3) | | 0.85 |
| Anti-ds DNA (IU/ml) | | | | |
| Dx | 98.9 (140.0) | 889.4 (1840.2) | 292.1 (675.9) | 0.57 |
| AA | 243.5 (379.8) | 107.9 (208.5) | | 0.48 |
| Δ(AA-Dx) | 115.8 (312.3) | −778.4 (1835.1) | | 0.10 |
| CRP (mg/l) | | | | |
| Dx | 20 (26) | 22 (44) | 18 (29) | 0.43 |
| AA | 23 (28) | 32 (48) | | 0.81 |
| Δ(AA-Dx) | 1 (24) | 8 (29) | | 0.60 |
| SLEDAI | | | | |
| Dx | 13.7 (5.9) | 17.0 (8.6) | 14.2 (6.8) | 0.36 |
| AA | 10.3 (5.98) | 12.5 (8.1) | | 0.36 |
| Δ(AA-Dx) | −3.4 (4.6) | −4.5 (9.7) | | 0.67 |

*Statistically significant using Kruskal-Wallis test or Mann-Whitney test.
Group 1, lupus enteritis; group 2, acute abdominal pain without lupus enteritis; group 3, SLE without acute abdominal pain; WBC, white blood cells; Hb, haemoglobin; PLT, platelets; Dx, at diagnosis of SLE; AA, acute abdominal pain; Δ(AA-Dx), difference between acute abdominal pain and at diagnosis of SLE.



**Figure 1**  Abdominal CT scan showing circumferential wall thickening and target sign in small and large bowels. Mesenteric change is also noted with engorged mesenteric vessels and haziness.

our data, lupus enteritis (45%) was the most common cause of acute abdominal pain and the incidence was comparable with the previous report.[6] Contrary to the previous report of Medina *et al*,[6] the SLEDAI was similar at the time of diagnosis of SLE among the three groups and at the time of acute abdominal pain between groups 1 and 2. In addition, the SLEDAI calculated at the time of acute abdominal pain was lower than that at the time of diagnosis of SLE in both groups 1 and 2. Thus, it implies that acute abdominal pain, including lupus enteritis, might occur in patients whose disease activities had been under control. Only a drop in the WBC count at the time of acute abdominal pain was much more prominent in group 1 than in group 2. Therefore, the SLEDAI and laboratory indices, except leucopenia, did not correlate with the occurrence of lupus enteritis.

In SLE and SLE-like conditions, a prevalence of aPL of between 18% and 61% has been reported.[1 8] Several reports have described an association between intestinal infarction and aPL.[6 9] Although mesenteric vascular thrombosis was not found on abdominal CT scans in our series, we compared the incidence of aPL among the three groups, but no differences were found. Therefore, autoantibodies, including aPL, did not correlate with the occurrence of lupus enteritis.

The diagnosis of bowel ischaemia is often difficult to make on the basis of plain radiography and barium studies. The common CT findings in mesenteric ischaemia include dilated bowel, focal or diffuse bowel wall thickening, abnormal bowel wall enhancement (double halo or target sign), mesenteric oedema, engorged mesenteric vessel, and ascites.[10] However, the lack of specificity of these signs is a limitation of CT because they can also be seen in patients with pancreatitis, mechanical bowel obstruction, peritonitis, or inflammatory bowel disease, all of which may mimic intestinal ischaemia.[10] In the present series, the jejunum and ileum were the sites most commonly affected. The segments of bowel thickening were multifocal and not confined to a single vascular territory in 19/21 cases with bowel wall thickening because mesenteric vasculitis may affect several vessels simultaneously.[11] It seemed that rectal involvement was rare owing to the rich and multiple blood supply of the rectum. Therefore, in the clinical

investigation of abdominal pain in SLE, involvement of multiple vascular territories on CT scans, in addition to improvement after intravenous prednisolone treatment, may favour a diagnosis of reversible ischaemic bowel disease.

Because of the paucity of cases of lupus enteritis, no randomised clinical trials have investigated its optimal treatment. Many cases of successful treatment of intestinal vasculitis with high dose prednisolone only have been reported.[6 12] For corticosteroid resistant GI vasculitis, there have been recent reports of its successful treatment with intravenous methylprednisolone and cyclophosphamide in SLE.[13] In the current series, all the patients with lupus enteritis responded well to high dose prednisolone (1 mg/kg/day) treatment. Although four patients relapsed, they responded well to high dose prednisolone without the addition of cyclophosphamide. Medina et al emphasise the importance of early laparotomy because of the high mortality. In general, the outcome in patients with perforation is poor, with death occurring in more than two thirds of cases.[14] However, as shown in our series, complete resolution of acute abdominal pain took a few weeks and no patients developed GI perforation. Therefore, our data suggest that laparotomy could be delayed unless there was definite evidence that GI perforation had occurred.

In conclusion, our study indicates that lupus enteritis is the most common cause of acute abdominal pain in SLE. The SLEDAI, laboratory indices except leucopenia, antiphospholipid antibody, and autoantibodies do not correlate with the occurrence of lupus enteritis. Intravenous high dose prednisolone is successful for the treatment of lupus enteritis, including patients who have relapsed, without the addition of immunosuppressive agents.

. . . . . . . . . . . . . . . . . . . .

## Authors' affiliations

**C-K Lee, M S Ahn, E Y Lee, J H Shin, Y-S Cho, B Yoo, H-B Moon,** Division of Allergy and Rheumatology, Department of Internal Medicine, Asan Medical Centre, Seoul, Korea
**H K Ha,** Department of Radiology, University of Ulsan College of Medicine, Asan Medical Centre, Seoul, Korea

Correspondence to: Dr B Yoo, Division of Allergy and Rheumatology, Department of Internal Medicine, University of Ulsan College of Medicine, Asan Medical Center, 388-1 Pungnap-dong, Songpa-gu, Seoul 138-736, Korea; byoo@amc.seoul.kr

Accepted 18 December 2001

## REFERENCES

1 **Alarcon-Segovia D**, Deleze M, Oria CV, Sanchez-Guerrero J, Gomez-Pacheco L, Cabiedes J, et al. Antiphospholipid antibodies and antiphospholipid syndrome in systemic lupus erythematosus. A prospective analysis of 500 consecutive patients. Medicine (Baltimore) 1989;68:353–65.
2 **Bombardier C**, Gladman DD, Urowitz MB, Caron D, Chang CH, and the Committee on Prognosis studies in SLE: Derivation of the SLEDAI. A disease activity index of lupus patients. Arthritis Rheum 1992;35:630–40.
3 **Tan EM**, Cohen AS, Fries JF, Masi AT, McShane DJ, Rothfield NF, et al. The 1982 revised criteria for the classification of SLE. Arthritis Rheum 1982;25:1271–7.
4 **Byun JY**, Ha HK, Yu SY, Min JK, Park SH, Kim HY, et al. CT features of systemic lupus erythematosus in patients with acute abdominal pain: emphasis on ischemic bowel disease. Radiology 1999;211:203–9.
5 **Harris EN**, Pierangeli SS, Gharavi AE. Diagnosis of the antiphospholipid syndrome: a proposal for use of laboratory tests. Lupus 1998;7(suppl 2):S144–8.
6 **Medina F**, Ayala A, Jara LJ, Becerra M, Miranda JM, Fraga A, et al. Acute abdomen in systemic lupus erythematosus: the importance of early laparotomy. Am J Med 1997;103:100–5.
7 **Drenkard C**, Villa AR, Reyes E, Abello M, Alarcon-Segovia D. Vasculitis in systemic lupus erythematosus. Lupus 1997;6:235–42.
8 **Lockshin MD**. Antiphospholipid antibody syndrome. Rheum Dis Clin North Am 1994;20:45–59.
9 **Sanchez-Guerrero J**, Reyes E, Alarcon-Segovia D. Primary antiphospholipid syndrome as a cause of intestinal infarction. J Rheumatol 1992;19:623–5.
10 **Taourel PG**, Deneuville M, Pradel JA, Regent D, Bruel JM. Acute mesenteric ischemia: diagnosis with contrast-enhanced CT. Radiology 1996;199:632–6.
11 **Kirshy DM**, Gordon DH, Atweh NA. Abdominal computed tomography in lupus mesenteric arteritis. Comput Med Imaging Graph 1991;15:369–72.
12 **Cabrera GE**, Scopelitis E, Cuellar ML, Silveira LH, Mena H, Espinoza LR. Pneumatosis cystoides intestinalis in systemic lupus erythematosus with intestinal vasculitis: treatment with high dose prednisolone. Clin Rheumatol 1994;13:312–16.
13 **Grimbacher B**, Huber M, Kempis J, Kalden P, Uhl M, Kohler H, et al. Successful treatment of gastrointestinal vasculitis due to systemic lupus erythematosus with intravenous pulse cyclophosphamide: a clinical case report and review of the literature. Br J Rheumatol 1998;37:1023–8.
14 **Hoffman BI**, Katz WA. The gastrointestinal manifestations of systemic lupus erythematosus: a review of the literature. Semin Arthritis Rheum 1980;9:237–47.

**<u>EXHIBIT 7</u>**

Search... 🔍



# AMERICAN COLLEGE OF RHEUMATOLOGY
EDUCATION • TREATMENT • RESEARCH

# Lupus

## Fast Facts



- Lupus occurs ten times more often in women than in men.
- Treatment depends on the organs involved .
- Involvement of the kidneys or/and the brain is the most serious manifestation of lupus.
- People can live well with lupus if they actively work toward good health.
- Sun exposure can lead to lupus flares.
- Carefully plan your pregnancies; lupus can flare during pregnancy and can affect its outcome.

Systemic lupus erythematosus, referred to as SLE or lupus, is a chronic (long-term) disease that causes systemic inflammation which affects multiple organs.

In addition to affecting the skin and joints, it can affect other organs in the body such as the kidneys, the tissue lining the lungs (pleura), heart (pericardium), and brain. Many patients experience fatigue, weight loss, and fever.

Lupus flares vary from mild to serious. Most patients have times when the disease is active, followed by times when the disease is mostly quiet - referred to as a remission. Yet, there is much reason for hope. Improvements in treatment have greatly improved these patients' quality of life and increased their lifespan.

## ⊞ What causes lupus?

When healthy, our immune system protects the body from foreign germs and cancers. With lupus, the immune system misfires and attacks "self", the patient's own tissues, in a process called autoimmunity or "loss of self-tolerance".

In lupus as the attack goes on, all the branches of the immune system join the fight. This leads to significant and intense inflammation. The cause of Lupus is unknown, as well as what drives its diverse presentation. We know that multiple factors are required, including: the "right" genetic makeup, environmental exposures, and organ specific characteristics. People with lupus may also have an impaired process for clearing old and damaged cells from the body, which in turn provides continuous stimuli to the immune system and leads to abnormal immune response.

Most often, lupus starts in young females in their fertility age. The disease is more common in some ethnic groups, mainly blacks and Asians, and tends to be worse in these groups.

## ⊞ How is lupus diagnosed?

Lupus can be hard to detect because it is a complex disease that has many symptoms, and they can come on slowly. As experts in diagnosing and treating autoimmune diseases such as lupus, rheumatologists can best determine whether a patient has lupus and advise them about treatment options.

People with lupus often have symptoms that are not specific to lupus. These include fever, fatigue, weight loss, blood clots, and hair loss in spots or around the hairline. They may also have heartburn, stomach pain, and poor circulation to the fingers and toes. Pregnant women can have miscarriages.

The American College of Rheumatology has a list of symptoms and other measures that doctors can use as a guide to decide if a patient with symptoms has lupus.

- Rashes:
  - butterfly-shaped rash over the cheeks - referred to as malar rash
  - red rash with raised round or oval patches - known as discoid rash
  - rash on skin exposed to the sun
- Mouth sores: sores in the mouth or nose lasting from a few days to more than a month
- Arthritis: tenderness and swelling lasting for a few weeks in two or more joints
- Lung or heart inflammation: swelling of the tissue lining the lungs (referred to as pleurisy or pleuritis) or the heart (pericarditis), which can cause chest pain when breathing deeply
- Kidney problem: blood or protein in the urine, or tests that suggest poor kidney function

- Neurologic problem: seizures, strokes, or psychosis (a mental health problem)
- Abnormal blood tests such as:
  - low blood cell counts: anemia, low white blood cells, or low platelets
  - positive antinuclear antibodies (ANA) result: antibodies that can cause the body to begin attacking itself that are present in nearly all lupus patients
  - certain abnormal antibodies: anti-double-strand DNA (called anti-dsDNA), anti-Smith (referred to as anti-Sm), or antiphospholipid antibodies

If your doctor suspects you have lupus based on your symptoms, a series of blood tests will be done in order to confirm the diagnosis. The most important blood screening test is ANA. If ANA is negative, you don't have lupus. However, if ANA is positive, you might have lupus and will need more specific tests. These blood tests include antibodies to anti-dsDNA and anti-Sm, which are specific to the diagnosis of lupus.

The presence of antiphospholipid antibodies signals a raised risk for certain complications such as miscarriage or blood clots.Doctors also may measure levels of certain complement proteins (a part of the immune system) in the blood, to help detect the disease and follow its progress.

## How is lupus treated?

Lupus is a chronic disease. The treatment objective is to induce remission. Treatment depends on the type of symptoms you have and how serious they are.

Common treatment options include:

- Nonsteroidal anti-inflammatory drugs (NSAIDs): NSAIDs decrease joint swelling, joint pain, fever, and inflammation of the heart and lung linings. These drugs include ibuprofen (brand names Motrin, Advil) and naproxen (Naprosyn, Aleve). Some of these NSAIDs can cause serious side effects like stomach bleeding or kidney damage. Always check with your doctor before taking any medications that are over the counter (without a prescription) for your lupus.
- Antimalarial drugs: Hydroxychloroquine (Plaquenil), recommended in every patient with lupus. Hydroxychloroquine was used in the past to prevent and treat malaria and found, during World War 2, to be effective for lupus related arthritis, fatigue, rashes, and mouth sores.
- Corticosteroids and immune suppressants: Patients with serious or life-threatening problems such as kidney inflammation, lung or heart involvement, and central nervous system symptoms need more "aggressive" (stronger) treatment. This may include high-dose corticosteroids such as prednisone (Deltasone and others) and drugs that suppress the immune system. Immune suppressants include azathioprine (Imuran), cyclophosphamide (Cytoxan), and cyclosporine (Neoral, Sandimmune). Recently mycophenolate mofetil has been used to treat severe kidney disease in lupus – referred to as lupus nephritis.
- Biologics: In 2011, the FDA approved a biologic, belimumab (Benlysta), for the treatment of active SLE in adult patients. Benlysta has shown to be effective in mild forms of Lupus and it is the first new drug approved for lupus since 1955.
- Combination treatment: Health care providers may combine a few medications to control lupus and prevent tissue damage. Each treatment has risks and benefits. Most immune-suppressing medications may cause side effects and require close monitoring. Side effects of these drugs may include a raised risk of infections as well as nausea, vomiting, hair loss, diarrhea, high blood pressure, and osteoporosis (weak bones). Rheumatologists may lower the dose of a drug or stop a medicine because of side effects or when the disease goes into remission. As a result, it is important to receive careful and frequent health exams and lab tests to track your symptoms and change your treatment as needed.

## Broader health impact of lupus

Lupus disease, especially when active, could lead to accelerated atherosclerosis (clogging of the arteries) which can develop in young women and could also lead to heart attacks, heart failure, and strokes. Thus, it is vital that patients with lupus, in addition to controlling their disease, exercise and lower other risk factors for heart disease, such as smoking, high blood pressure, and high cholesterol.

Renal inflammation is one of the common and most serious manifestations of lupus. It could go undetected and can lead to renal failure and dialysis. You can help prevent these serious outcomes by seeking treatment at the first signs of kidney disease. These signs include:

- High blood pressure
- Swollen feet and hands
- Puffiness around your eyes
- Changes in urination (blood or foam in the urine, going to the bathroom more often at night, or pain or trouble urinating)

## Living with lupus

Most people with lupus can live normal lives. Treatment of lupus has improved, and people with the disease are living longer. Here are a couple of tips that may help you when living with lupus:

- Form a support system. A good doctor-patient relationship and support from family and friends can help you cope with this chronic and often unpredictable illness.
- Get involved in your care. Learn as much as you can about lupus, your medications, and what kind of progress to expect. Take all your medications as your doctor prescribes, and visit your rheumatologist often to prevent serious problems. This lets your doctor keep track of your disease and change your treatment as needed. If you do not live near a rheumatologist, you may need to have your primary care doctor manage your lupus with the help of a rheumatologist.
- Stay active. Exercise helps keep joints flexible and may prevent heart disease and strokes. This does not mean overdoing it. Switch off doing light to moderate exercise with times of rest.

- Avoid excess sun exposure. Sunlight can cause a lupus rash to flare and may even trigger a serious flare of the disease itself. When outdoors on a sunny day, wear protective clothing (long sleeves, a big-brimmed hat) and use lots of sunscreen.

If you are a young woman with lupus and wish to have a baby, carefully plan your pregnancy. With your doctor's guidance, time your pregnancy for when your lupus activity is low. While pregnant, avoid medications that can harm your baby. These include cyclophosphamide, cyclosporine, and mycophenolate mofetil. If you must take any of these medicines, or your disease is very active, use birth control. For more information, see Pregnancy and Rheumatic Disease.

Rheumatologists have long been concerned that the female hormone estrogen or treatment with estrogen may cause or worsen lupus. Recent research showed that estrogen therapy can trigger some mild or moderate flares of lupus, but does not cause symptoms to get much worse. Yet, estrogen can raise the risk of blood clots. Thus, you should not take estrogen if your blood tests show antiphospholipid antibodies (meaning you already have a high risk of blood clots).

*This patient fact sheet is provided for general education only. Individuals should consult a qualified health care provider for professional medical advice, diagnosis and treatment of a medical or health condition.*

© 2019 American College of Rheumatology. All rights reserved.

**EXHIBIT 8**

 NATIONAL ARCHIVES

# Veterans' Medical and Health Records

- Filing a Claim for Medical Benefits?

The Official Military Personnel Files (OMPF), held at the National Personnel Records Center (NPRC), are administrative records containing information about the subject's military service history. Many OMPFs contain both personnel and former active duty health records, but the service branches discontinued retiring the health record portion to the NPRC in the 1990s.

In the past, all of the military services retired the individual health record, along with the personnel record, to the NPRC upon a service member's separation from service. The Army and the Air Force retired its health records with the Official Military Personnel File, while the Department of the Navy (including the Navy, Marine Corps and Coast Guard) retired these files separately to the NPRC until the 1980s.

Health records cover the outpatient, dental and mental health treatment that former members received while in military service. Health records include induction and separation physical examinations, as well as routine medical care (doctor/dental visits, lab tests, etc.) when the patient was not admitted to a hospital.

In comparison, clinical (hospital inpatient) records were generated when active duty members were actually hospitalized while in the service. Typically, these records are NOT filed with the health records but are generally retired to the NPRC by the facility which created them (see clinical records for more information). Medical records from the Department of Veterans Affairs (VA) are also not included.

In the 1990s, the military services discontinued the practice of filing health records with the personnel record portion at the NPRC. In 1992, the Army began retiring most of its former members' health records to the Department of Veterans Affairs (VA). Over the next six years, the other services followed suit. In 2014, the military services dicontinued the practice of retiring the records to the Department of Veterans Affairs (VA). In order to determine where a medical record is located, please see the chart below:

| Branch | Status | Date | Record Location |
|---|---|---|---|
| Army | Discharged, retired, or separated from any component | 10/16/1992 to 12/31/2013 | Department of VA, Records Management Center |
| | | on or after 01/01/2014 | AMEDD Record Processing Center |
| Navy | Discharged, retired, or separated from any component | 01/31/1994 to 12/31/2013 | Department of VA, Records Management Center |
| | | on or after 01/01/2014 | BUMED Navy Medicine Records Activity |
| Air Force | Discharged, retired, or separated from any component | 05/01/1994 to 12/31/2013 | Department of VA, Records Management Center |
| | | on or after 01/01/2014 | AF STR Processing Center |
| | Discharged or retired from Reserves or National Guard | 06/01/1994 to 12/31/2013 | Department of VA, Records Management Center |
| | | on or after 01/01/2014 | AF STR Processing Center |
| Marine Corps | Discharged, retired, or separated from any component | 05/01/1994 to 12/31/2013 | Department of VA, Records Management Center |
| | | on or after 01/01/2014 | BUMED Navy Medicine Records Activity |
| Coast Guard | Discharged, retired, or separated from Active Duty - Reservists with 90 days active duty for training | 04/01/1998 to 09/30/2014 | Department of VA, Records Management Center |

–

# Filing a claim for medical benefits?

Veterans who plan to file a claim for medical benefits with the Department of Veterans Affairs (VA) do not need to request a copy of their military health record from the NPRC. After a claim is filed, the VA will obtain the original health record from the NPRC. In addition, many health records were lent to the Department of Veterans Affairs prior to the 1973 Fire.

Veterans who filed a medical claim should contact the Department of Veterans Affairs (VA) in order to determine if their record is already on file. The VA Toll Free # is: 1-800-827-1000 - it will connect the caller to the nearest VA office.

**The U.S. National Archives and Records Administration**
1-86-NARA-NARA or 1-866-272-6272

**EXHIBIT 9**

Contact Us      FAQs      Gallery      TRICARE

[                                              ] Search

| About the MHS | Topics | Training | Policies | Reference Center | News & Gallery | I am a... |

MHS Home > Frequently Asked Questions > Physical Disability Board of Review                                    Need larger text?

**Frequently Asked Questions**

2018 Health Related
Behavior Survey for Active
Duty Service Members

2015 Health Related
Behavior Survey for Active
Duty Service Members

Adenovirus

AFMES Medical Legal
Examinations

Armed Forces Health
Surveillance Branch

Armed Forces Repository of
Specimen Samples

Autism Care Demonstration:
General

Autism Care Demonstration:
Reimbursement Rates

Chikungunya

Telehealth

Cognitive Rehabilitation
Therapy

Compound Drugs

Conducting Health Care
Surveys in the Department
of Defense

Defense Medical Logistics
Vendor Day

Defense Medical Readiness
Training Institute

Dengue

Depleted Uranium

Depleted Uranium: Chemical
Effects

Depleted Uranium: Radiation
Effects

Drug Take Back Program

Dugway Proving Ground

Ebola

Electronic Prescribing

Enhanced Multi-Service
Markets

Field Testing of
Hallucinogenic Agents

Fraud and Abuse

Gulf War Illness

Health IT Innovation and
Research

HIPAA Transactions, Code
Sets & Identifiers:

# Physical Disability Board of Review

Questions and answers about the Physical Disablity Board of Review (PDBR).

**Recommended Content:**
Physical Disability Board of Review

**Q1:** What is a Physical Disability Board of Review?

**Q2:** Who is eligible for a Physical Disability Board of Review?

**Q3:** If the eligible Veteran is incapacitated or deceased, can someone else request a Physical Disability Board of Review on his or her behalf?

**Q4:** How long do I have to apply for the Physical Disability Board of Review?

**Q5:** How do I request the Physical Disability Board of Review?

**Q6:** I wasn't in the Air Force. Why am I mailing my application for the Physical Disability Board of Review to Randolph AFB?

**Q7:** What should I include with my application for the Physical Disability Board of Review?

**Q8:** Is there another way the Physical Disability Board of Review occurs?

**Q9:** What if I don't consent to a Physical Disability Board of Review initiated and then later change my mind?

**Q10:** What is the difference between a Board for Correction of Military (or Naval) Records (BCMR/BCNR) review and a Physical Disability Board of Review; and can I file with the PDBR and BCMR/BCNR?

**Q11:** Can you give me an example of differences between Board for Correction of Military (or Naval) Records (BCMR/BCNR) review and a Physical Disability Board of Review?

**Q12:** Should I choose a Board for Correction of Military (or Naval) Records (BCMR/BCNR) review or a Physical Disability Board of Review?

**Q13:** Is there someone who can help me make the choice between a Board for Correction of Military (or Naval) Records (BCMR/BCNR) review and a Physical Disability Board of Review?

**Q14:** Will the government pay for an attorney to advise me in the matter of my Physical Disability Board of Review?

**Q15:** Can my service disability rating be lowered by the Physical Disability Board of Review?

**Q16:** Can I appear in person for the Physical Disability Board of Review?

**Q17:** Why does the Physical Disability Board of Review need my VA records?

   **A:**  Part of the PDBR review process is to consider the rating(s) previously awarded to an applicant by the VA for his or her unfitting medical condition(s), but particularly those awarded with an effective date within twelve months of the applicant's date of separation. Access to applicable VA rating and medical documents, though not required by policy, are instrumental to the PDBR's review process and greatly facilitate making any revision to the original disability rating provided by the military department PEB concerned.

**Q18:** Will my privacy be respected during the Physical Disability Board of Review?

**Q19:** What if I don't consent to the release of my VA records for the Physical Disability Board of Review?

**Q20:** Will the Physical Disability Board of Review review my case if my VA disability determination is pending?

**Q21:** Where does the Physical Disability Board of Review take place?

**Q22:** Who makes the final decision for the Physical Disability Board of Review?

**Q23:** How will I be notified about the decision of the Physical Disability Board of Review?

**Q24:** Will the Physical Disability Board of Review decision be explained to me?

**Q25:** If the decision of the Physical Disablity Board of Review changes something in my records, when will the

Transactions

HIPAA Transactions, Code
Sets & Identifiers: Code Sets

HIPAA Transactions, Code
Sets & Identifiers:
Identifiers

HIV/AIDS Prevention and
Treatment

Human Subject Research at
Fort Detrick

Malaria

Office of General Counsel

Patient Safety Order
Materials

Pharmaceutical
Manufacturers: Contact Us -
Questionnaire

Pharmaceutical
Manufacturers: Contact Us -
TRICARE Retail Refund
Website

Pharmaceutical
Manufacturers: Contact Us -
Billing and Pricing

Pharmaceutical
Manufacturers: Contact Us -
Disputes

Physical Disability Board of
Review

Pharmacy Analytics Support
Section: MTF Corner

Privacy and Civil Liberties
Data Sharing Agreement
Program

Project 112 SHAD

Reserve Health Readiness
Program: General

Reserve Health Readiness
Program: Unit POC

Reserve Health Readiness
Program: Service Member

Reserve Health Readiness
Program: DoD Civilian

Separation Health
Assessment

Small Business Programs

TEAM UP

Third Party Collection
Program

TRICARE Formulary

TRICARE Patient Transfer
Pilot

Uniform Business Office
(UBO)

VLER HIE

Warfare Exposure

West Nile Virus

Zika Virus

correction be effective?

**Q26:** Can I appeal the decision of the Physical Disability Board of Review?

**Q27:** Where can I find more specific guidance on the processing and criteria for the Physical Disability Board of Review process?

**Q28:** Whom can I contact if I have additional questions about the Physical Disability Board of Review?

**Q29:** Am I eligible for Physical Disability Board of Review of my disability separation if I was put on the Temporary Disability Retired List (TDRL) prior to September 11, 2001?

**Q30:** Am I eligible for Physical Disability Board of Review if I was placed on the Temporary Disability Retired List (TDRL) between September 11, 2001 and December 31, 2009 and then permanently separated from my Military Service, with severance pay (e.g. taken off the TDRL) with a combined rating of 20% or less AFTER December 31, 2009?

**Q31:** What conditions will be reviewed by the Physical Disability Board of Review if I leave block #3 of the DD Form 294 blank in my application?

**Q32:** What will be reviewed by the Physical Disability Board of Review if I only ask for one (named) medical condition to be reviewed, from a PEB with multiple medical conditions?

**Q33:** Can I ask the Physical Disability Board of Review to review more of my medical conditions?

**Q34:** How can I get the most comprehensive PDBR review of my permitted medical conditions

## About the MHS

MHS Leadership Biographies

Careers

Office of the Assistant Secretary of Defense for Health Affairs

MHS Special Recognition

Contact Us

MHS Social Media

Other MHS Organizations

Give Your Feedback

## Military Health Topics

Access, Cost, Quality, and Safety

Acquisition, Procurement and Small Business

Business Support

Conditions and Treatments

Health Readiness

Operation Live Well

Privacy and Civil Liberties

Research and Innovation

Technology

Military Medical History

All Topics

## News

Articles

Calendar of Events

Gallery

In the Spotlight

## Training Center

Military Health System Staff

Federal Healthcare Consortium

Clinicians and Healthcare Providers

## Policies

## Reference Center

Congressional Testimonies

Fact Sheets

FOIA Library

Forms & Templates

MHS Health Care Glossary

Meeting References

Newsletters & Bulletins

Policies

Posters

Presentations

Publications

Reports

Technical Documents

Training Booklets & Toolkits

## I am a...

Caregiver or Family Member

Leader

Member of the Media

Medical Professional, Educator or Researcher

Member of the MHS Staff

Service Member

TRICARE Beneficiary

Vendor

Veteran




Subscribe for updates

### Contact Us



Questions or feedback, let us know!


Safe Helpline
Sexual Assault Support for the DoD Community
safehelpline.org | 877-995-5247


Veterans Crisis Line
Military Crisis Line
1-800-273-8255 PRESS ❶




Health.mil

Privacy Policy | No Fear Act | Fraud and Abuse | Accessibility/508 Compliance | FOIA | DHAOIG      USA Gov | White House


**DHA Address:** 7700 Arlington Boulevard | Suite 5101 | Falls Church, VA | 22042-5101

Some documents are presented in Portable Document Format (PDF). A PDF reader is required for viewing: Download a PDF Reader or learn more about PDFs.

https://health.mil/Frequently-Asked-Questions/Physical-Disability-Board-of-Review    3/3

**EXHIBIT 10**



**DEPARTMENT OF VETERANS AFFAIRS**
**Records Management Center**
**P.O. Box 5020**
**St. Louis, MO  63115**

August 31, 2016

EMILY M WEXLER
SIDLEY AUSTIN LLP
1 SOUTH DEARBORN STREET
CHICAGO, IL 60603

In reply, refer to:
376/272/SK1
File Number: ▉▉▉▉▉▉
DANIEL KELLY

**Re: Privacy Act Request**

To Whom It May Concern:

This is in response to your Privacy Act request dated October 19, 2015.  We have provided you
with the following records: the entire VA claims folder on file at this office.

This office will be providing your records on a compact disc (CD) for use on your personal
computer.  Only records of 10 pages or more are eligible for CD printing.   The CD can be
viewed on all computers through the use of Adobe Reader software, which is available online for
free.

We are withholding all information which if disclosed: would fall under the deliberative process
privilege under FOIA Exemption 5 [5 U.S.C. § 552 (b)(5)].

Thank you for your interest in the Department of Veterans Affairs.  Customer service is very
important to us.  If you have questions or concerns regarding your request for records under the
Privacy Act or Freedom of Information Act, please contact our agency at 1-888-533-4558.
Please refer to the assigned case number so we may easily locate your information.

If you have questions or concerns regarding your entitlement to VA benefits or the status of your
claim, please contact the VA National Call Center at 1-800-827-1000.

Sincerely yours,

**Records Management Center Director**



**DEPARTMENT OF VETERANS AFFAIRS**
**Records Management Center**
**P.O. Box 5020**
**St. Louis, MO  63115**

July 19, 2016

EMILY M WEXLER                                    In reply, refer to:
SIDLEY AUSTIN LLP                                 376/272/EMW
1 SOUTH DEARBORN STREET                            File Number: ██████
CHICAGO, IL 60603                                  Daniel Kelly

**Re: Privacy Act Request**

To Whom It May Concern:

This letter acknowledges receipt of your Privacy Act request dated October 15, 2015.  Your VA
claim number or social security number will serve as your reference number. Please refer to this
number when communicating with our office about your request.

We will begin searching for records responsive to your request that are within our holdings. We
will grant you access to the requested records, *if found*, providing the records are not exempted
from disclosure by law. Any releasable sections of the requested records shall be provided to you
after redaction of the parts that are exempt.

Your request will be processed in the order of receipt. You may expect to receive a response as
soon as possible. This office provides records of 10 pages or more on a compact disc (CD) for
use on your personal computer. Records fewer than 10 total pages will be provided as paper
copies. The CD can be viewed on all computers through the use of Adobe Reader software,
which is available online for free.

To request your responsive records on paper, please mail your request to:

**ATTN:** *Paper Copy Request* at the address above or you may fax your request to 314-679-3732.

Thank you for your interest in the Department of Veterans Affairs.  Customer service is very
important to us.  If you have questions or concerns regarding your request for records under the
Privacy Act or Freedom of Information Act, please contact our agency at 888-533-4558 and refer
to your reference number.

If you have any questions regarding your entitlement to VA benefits or the status of your claim,
please contact the VA National Call Center at 1-800-827-1000.

Sincerely yours,

# Records Management Center Director

Case 1:19-cv-00331-RC   Document 1   Filed 02/08/19   Page 76 of 80

*Establish EP 510*

*7/11/16 Rivy*

# SIDLEY AUSTIN LLP

| | | | |
|---|---|---|---|
| SIDLEY AUSTIN LLP | BEIJING | HONG KONG | SHANGHAI |
| ONE SOUTH DEARBORN STREET | BOSTON | HOUSTON | SINGAPORE |
| CHICAGO, IL 60603 | BRUSSELS | LONDON | SYDNEY |
| (312) 853 7000 | CENTURY CITY | LOS ANGELES | TOKYO |
| (312) 853 7036 FAX | CHICAGO | NEW YORK | WASHINGTON, D.C. |
| | DALLAS | PALO ALTO | |
| | GENEVA | SAN FRANCISCO | |

ewexler@sidley.com
(312) 853 7074

FOUNDED 1866

February 29, 2016

*OFFICE OF THE GENERAL COUNSEL
RECEIVED (024)*

*MAR 17 2016*

**VIA CERTIFIED MAIL**

*3766 DEPT OF VETERANS AFFAIRS*

*DROP MAIL*

Department of Veterans Affairs
Office of General Counsel (024)
810 Vermont Avenue, NW
Washington, DC 20420

> Re:   **FREEDOM OF INFORMATION ACT ADMINISTRATIVE APPEAL**
>        **Daniel P. Kelly**
>        **VA File Number:** ▮▮▮▮▮▮▮

To Whom It May Concern:

This letter constitutes an administrative appeal of Department of Veterans Affairs ("VA") action concerning a request for documents made under 38 C.F.R. § 1.577 (2008), and the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, *et seq*.

In a letter dated October 13, 2015, I submitted a FOIA request for documents on behalf of veteran Daniel P. Kelly to the Los Angeles Regional Benefit Office ("RO"), along with the appropriate consent for release of information (VA Form 3288) signed by the veteran. *See* Attachment A. I requested a copy of all documents contained in Mr. Kelly's VA claims file. My certified mail return receipts shows that the Los Angeles RO received this request for documents on October 19, 2015. *See* Attachment B.

To date, we have not received any response from the RO, let alone any files. It has now been **over 80** business days since the RO received our letter.

The failure of the VA to respond to our request is in clear violation of 5 U.S.C. § 552(a)(6)(A)(i), which requires the VA to "determine within 20 days (excepting Saturdays, Sundays, and legal public holidays) after the receipt of any such request whether to comply with such request and shall immediately notify the person making such request of such determination and the reasons therefor, and of the right of such person to appeal to the head of the agency any adverse determination."

Sidley Austin LLP is a limited liability partnership practicing in affiliation with other Sidley Austin partnerships.



FOIA/Privacy Act Officer
February 29, 2016
Page 2

        Please make a decision regarding this appeal within twenty (20) working days, as
required by 5 U.S.C. § 552(a)(6)(A)(ii).  If you have any questions, you may contact me at 312-
853-7074, or by e-mail at ewexler@sidley.com.

                            Very truly yours,

                            Emily M. Wexler

                            Emily M. Wexler

CLG

Enclosures

cc:     Daniel P. Kelly

ACTIVE 213365954v.1

COPY MADE BY VARMC, ST. LOUIS FROM A RECORD IN VA'S POSSESSION



| | |
|---|---|
| SIDLEY AUSTIN LLP<br>ONE SOUTH DEARBORN STREET<br>CHICAGO, IL 60603<br>(312) 853 7000<br>(312) 853 7036 FAX | BEIJING   HONG KONG   SHANGHAI<br>BOSTON   HOUSTON   SINGAPORE<br>BRUSSELS   LONDON   SYDNEY<br>CHICAGO   LOS ANGELES   TOKYO<br>DALLAS   NEW YORK   WASHINGTON, D.C.<br>FRANKFURT   PALO ALTO<br>GENEVA   SAN FRANCISCO |
| ewexler@sidley.com<br>(312) 853 7074 | FOUNDED 1866 |

October 13, 2015


FOIA/Privacy Act Officer
Los Angeles Regional Benefit Office
11000 Wilshire Blvd.
Los Angeles, CA  90024

      Re:   **Veteran:  Daniel P. Kelly**
            **VA File Number:** ▇▇▇▇▇▇▇

To Whom It May Concern:

This is a request for documents under 38 C.F.R. §1.577, and the Freedom of Information Act (FOIA), 5 U.S.C. § 552 on behalf of veteran Daniel P. Kelly ("Veteran").  We are assisting Veteran *pro bono* with a claim for military benefits.  Veteran has authorized the release of these Department of Veterans Affairs records to me by using VA Form 3288.  <u>See</u> enclosure.

I hereby request a copy of all documents contained in Veteran's VA claims folder, to *include all documents in the right, left, and center flaps.*  Please forward the documents to me at the above address.  I am requesting these documents so that I may better assist Veteran with a claim for military disability benefits.

Please send the documents in either electronic form or paper form, whichever is faster.

As provided in the FOIA, please respond to this request within 20 (twenty) business days.  I may be contacted at 312-853-7074 if there are any questions.  Thank you for your assistance.

            Very truly yours,

            *Emily M. Wexler*

            Emily M. Wexler

CLG

Enclosure: VA Form 3288
cc:    Daniel P. Kelly

Form Approved: OMB No. 2900-0028
Respondent Burden: 7.5 minutes

**VA** Department of Veterans Affairs

## REQUEST FOR AND CONSENT TO RELEASE OF INFORMATION FROM INDIVIDUAL'S RECORDS

**PRIVACY ACT STATEMENT:** The execution of this form does not authorize the release of information other than that specifically described below. The information requested on this form is solicited under Title 38, United States Code, and will authorize release of the information you specify. The information may also be disclosed outside VA as permitted by law to include disclosure as stated in the "Notices of Systems of VA Records" published in the Federal Register in accordance with the Privacy Act of 1974.

**RESPONDENT BURDEN:** VA may not conduct or sponsor, and the respondent is not required to respond, to this collection of information unless it displays a valid OMB Control Number. The Privacy Act of 1974 (5 U.S.C. 552a) and VA's confidentiality statute (38 U.S.C. 5701) as implemented by 38 CFR 1.526(a) and 38 CFR 1.576(b) require individuals to provide written consent before documents or information can be disclosed to third parties not allowed to receive records or information under any other provision of law. The information requested is approved under OMB Control Number 2900-0028 and is necessary to ensure that the statutory requirements of the Privacy Act and VA's confidentiality statute are met.

Responding to this collection of information is voluntary. However, if the information is not furnished, we may not be able to comply with your request. Public reporting burden for this collection is estimated to average 7.5 minutes per respondent, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspects of this collection of Information, including suggestions for reducing this burden, to the VA Clearance Officer (005E3), 810 Vermont Avenue, NW, Washington, DC 20420. **Send comments only. Do not send** this form or requests for benefits to this address.

| TO | Department of Veterans Affairs<br>Los Angeles Regional Office<br>11000 Wilshire Blvd<br>Los Angeles, CA 90024 | NAME OF INDIVIDUAL *(Type or print)*<br>DANIEL P. KELLY | |
|---|---|---|---|
| | | VA FILE NO. *(Include prefix)*<br>▇▇▇▇▇▇▇ | SOCIAL SECURITY NUMBER<br>▇▇▇▇▇▇▇ |

NAME AND ADDRESS OF ORGANIZATION OR INDIVIDUAL TO WHOM INFORMATION IS TO BE RELEASED

Emily M. Wexler
Sidley Austin LLP
1 South Dearborn Street
Chicago, IL 60603

### VETERAN'S REQUEST

I hereby request and authorize the Department of Veterans Affairs to release the following information from the records identified above to the organization, agency, or individual named hereon: ► NAME Daniel P. Kelly

INFORMATION REQUESTED *(Number each item requested and give the dates or approximate dates - period from and to - covered by each.)*

VA Claims File

PURPOSE(S) FOR WHICH THE INFORMATION IS TO BE USED.

Claim for military benefits

*NOTE: Additional information may be listed on the reverse side of this form.*

| SIGNATURE OF INDIVIDUAL OR PERSON AUTHORIZED TO SIGN FOR INDIVIDUAL *(Attach authority to sign, e.g., POA)*<br>*Daniel P. Kelly* | DATE<br>10-5-2015 |
|---|---|

VA FORM **3288**



NATIONAL PERSONNEL RECORDS CENTER
1 ARCHIVES DRIVE   ST LOUIS, MO 63138-1002
www.archives.gov

NATIONAL ARCHIVES

October 21, 2015

EMILY WEXLER
SIDLEY AUSTIN LLP
1 SOUTH DEARBORN ST
CHICAGO, IL 60603

**RE:**     **Veteran's Name:  KELLY, Daniel Patrick**
            **SSN/SN:**
            **Request Number:  2-19161891994**

Dear Recipient:

Thank you for contacting the National Personnel Records Center.  This is a complete copy as of this date obtained from the military service department's electronic records storage system. NPRC is certifying that this is a true and exact copy; however NPRC is acting as the Military Service Department's agent and does not have physical custody of this electronic record.

The Privacy Act of 1974 does not permit the release of personal information without the authorization of the individual concerned; therefore, if present in the record, personal data pertaining to other individuals have been blacked out in the enclosed documents.

If you have questions or comments regarding this response, you may contact us at 314-801-0800 or by mail at the address shown in the letterhead above.  If you contact us, please reference the Request Number listed above.  If you are a veteran, or a deceased veteran's next of kin, please consider submitting your future requests online by visiting us at http://vetrecs.archives.gov.

Sincerely,

JAMADJ MIMS-NEELY
Archives Technician (AFN-MC3C)

Enclosure(s)

**We Value Our
Veterans' Privacy**
*Let us know if we have
failed to protect it.*